STATE OF DELAWARE v. JOHN J. HALKO, JR.

(*December* 28, 1962.)

LYNCH, J., sitting.

*W. Laird Stabler, Jr.*, Deputy Attorney-General, for the State.

*Edmund D. Lyons* (of Morris, James, Hitchens and Williams) for the Defendant.

Superior Court for New Castle County, No. 637, Criminal Action, 1960 (Operating Motor Vehicle while under in-

fluence of Intoxicating liquor, 21 *Del. C.*, Sec. 4111); No. 639, Criminal Action, 1960, (Operating Motor Vehicle During period of Revocation, 21 *Del. C.*, Sec. 2746).

LYNCH, J.:

The record in this case shows Criminal Informations were filed against defendant on August 29, 1960, charging violations of certain criminal statutes noted above.

Defendant was arraigned before this Court on September 9, 1960 and he waived arraignment and entered pleas of not guilty. No efforts were then made by defendant to challenge his "detention" or his "arrest" or the "search" then or before his first trial; it was not until his conviction was reversed on an erroneous charge on "alibi" that these motions were filed. He was subsequently tried on these informations by the Court and a jury and found guilty on all charges.

On appeal (4 Storey 180, 175 A. 2d 42) his convictions were reversed on the single ground that the Trial Court erred in his charge to the jury that the burden was on defendant to prove an alibi, which was part of his defense. In its opinion the Supreme Court held, however, 175 A. 2d at 46, defendant's detention and arrest and ensuing "search" were lawful. The Court noted—

"We have had occasion to consider the provisions of the Uniform Arrest Act (11 *Del. C.* § 1902) in recent cases. * * * Its provisions are clearly applicable to the case before us. A

driver of a motor vehicle complains to the police that another driver, apparently intoxicated, has collided with his car and with a stop sign. At two o'clock in the morning the police find that driver in his car, slumped over the wheel unconscious with the lights on. The car is in front of his office or business premises; not his home. To hold that he was not 'abroad' within the meaning of the statute would be to emasculate it. To say that the driver is immune from detention under the statute because he has made himself too drunk to understand or answer the statutory questions approaches the absurd.

"The officers were clearly justified in detaining the defendant.

"* * * But this is not all. In our opinion, the detention of the defendant was proper as a lawful arrest. The statute authorizing police officers to arrest 'upon view' for violations of the motor vehicle laws (21 *Del. C.* § 701) constitutes an exception to the general law (11 *Del. C.* § 62) authorizing arrest without warrant for any crime upon 'probable cause'. See the discussion of the two statutes in *Rickards v. State*, 6 Terry 573, 45 Del. 573, 580-582, 77 A. 2d 199. The motor vehicle statute, providing for arrest 'on view', derives from Section 15 of the act of April 4, 1907 (24 *Del. L.* c. 144). Over half a century ago the motor vehicle certainly did not present the problem of law enforcement that it now presents. (The speed limit was twenty miles an hour.) The section embodies the common law rule of arrest (*Rickards v. State, supra*); surely the common law is capable of adapting itself to present day needs. The facts of this case (outlined above) establish that the officers knew from view—from their own senses—that the man at the wheel of his car was drunk. They knew that he was outside a place of business at two o'clock Sunday morning. The headlights were on. How did the car get there? It was a reasonable inference that he drove it there. And,

finally, the officers were informed by another driver—who was present at the scene—that the man at the wheel had been driving the car.

"In these circumstances, is it reasonable to say that the officers should have left the scene and gone to a magistrate to swear out a warrant? We do not think that the statute should be construed to require such a manifestly unreasonable course.

"In *State v. Koil*, 103 W. Va. 19, 136 S. E. 510, 511, the case of *State v. Lutz*, 85 W. Va. 330, 101 S. E. 434, is cited for the following holding (syllabus):

" 'An offense can be said to be said to be committed in the presence of an officer only when he sees it with his own eyes, or sees one or more of a series of acts constituting the offense, and is aided by his other senses or by information as to the others.'

"These cases are not in point on the facts, but the above holding (perhaps only dictum) seems to us to embody a sensible rule under modern conditions. The common law rule of arrest on view embodies the historical distinction between felonies and misdemeanors. This distinction has become largely arbitrary and dependent on legislative definition. *Brooks v. Taylor*, [2 Storey 138, 52 Del. 138], 154 A. 2d 386. To adhere blindly to an arbitrary distinction in applying the law of arrest seems to us unjustified. We do not mean that a police officer may arrest solely on suspicion of violation of the motor vehicle laws, as he may arrest on suspicion of felony; the language of the act of assembly—'on view'—controls. But we do say that this arbitrary distinction justifies a liberal and reasonable interpretation of the phrase 'on view'. When, as here, a police officer sees for himself a driver dead drunk at the wheel of his car, under circumstances indicating that the car has recently been operated and he is assured by another driver that the man at the wheel had actually been driving, we

are of opinion that the arrest is made for a violation 'on view' within the meaning of the statute.

"Since the detention and arrest was lawful, it follows that the search of the car was lawful."

After his conviction was reversed defendant changed counsel and on February 6, 1962 defendant filed a motion to suppress evidence found on him and in his car when he was arrested and for its return.

It appears from the first motion and the hearings that early on the morning of October 18, 1959 Troopers Stoops and Kair of the Delaware State Police went to investigate a complaint of drunken driving in the area of Maryland Avenue and Boxwood Road. They arrived at 15 Brookside Drive and there observed a motor vehicle parked before the private property of H & S Manufacturing Company, a Delaware corporation. Defendant owns all the stock of this corporation.

The complaint which brought the officers to 15 Brookside Drive was initiated by one William D. Forestieri, Jr. He complained that his car had been struck at the intersection of Middleborough Road, Maryland Avenue and Boxwood Road. When the Troopers arrived at the scene of the accident they were met by Mr. Forestieri, a Mr. Paul Perry and two policemen of the City of Wilmington. At this time (approximately 2:25 A.M., October 18, 1959) no warrants of any kind had issued for the arrest of the defendant. The officers opened the car door, removed Mr. Halko from his vehicle and took him into custody, and in the course of doing so they removed from Mr. Halko's vehicle an empty Sautern Wine Bottle and the stub of a parking ticket issued by the Wilmington Parking Authority; they also removed a "folder", either from the defendant or from his vehicle.

Brookside Drive is located in Ashley, a suburban subdivision almost immediately adjoining the city of Wilming-

ton. Ashley has been such a subdivision since about 1915. Plots of the subdivision and deeds of dedication of the streets in the subdivision—including Brookside Drive—are in and among the records of the Recorder of Deeds, New Castle County. A portion of one such plot appears as Appendix A of this opinion and illustrates the curve of Brookside Drive. H& S Manufacturing Company occupies lots 1 to 4 in Block B of Ashley and the location of these lots show on the plot.

I hold that I can so I do take Judicial Notice of such records and plots and what they disclose. Included in such records are large plots showing Brookside Drive. Brookside Drive is shown to be 40 feet in width—from building line to building line and it has a strip of asphalt paving approximating 19 feet in width; it is maintained by the State Highway Department. This strip goes down the center of Brookside Drive, leaving about 10 feet of macadamized shoulders on either side of the paved portion and stretching out to the building lines on the two sides of the Drive.

Brookside Drive starts at Maryland Avenue, a highly important and much travelled highway leading into Wilmington from many towns and subdivisions located to the south, east and southeast of Wilmington.

As stated, Brookside Drive was laid out with many curves of varying radii and it assumes a somewhat irregular course as it goes east from Maryland Avenue to its ultimate terminus. The property of H & S Manufacturing Company fronts on Brookside Drive and because of one curve of the Drive, the west end of the H & S building is four feet from the edge of the macadamized portion of Brookside Drive, while the east end of its building is some 12 feet from this macadamized shoulder.

One viewing Brookside Drive from Maryland Avenue looking to the east sees no fences or other obstructions along the building line in front of the H & S property; there is no

pavement in front of this property. The general appearance of Brookside Drive is illustrated by a photograph which appears as Appendix B of this opinion. Traffic seems to flow in both directions along and over the entire area—the paved area, the macadamized area and in the areas lying in between the edges of the macadamized portions and building lines clear up to the very front doors of the buildings fronting on Brookside Drive. H & S Manufacturing Company has posted "No Parking" and "No Trespassing" signs on the front of its building—but these signs give no notice to the public as to what is the restricted area and would hardly be discernible at night or in the early morning hours.

Cars are parked head in, backed in and parallel to the building lines, and when counsel and the Court were on the site when photographs were taken in May of 1962, preparatory and incident to one hearing on defendant's motion to suppress, the whole area was teeming with traffic, on foot and in motor vehicles, going in both directions and without the slightest recognition of building lines or impediments except where cars were parked at the time.

Defendant's car was found on Brookside Drive in front of the premises of H & S Manufacturing Company. Much effort was made by defendant to show that all or a major portion of his car was on the portion of land lying between the front of the building and the edge of the macadamized portion of Brookside Drive, so that it would have been necessary for the officers involved in opening the door of defendant's car and arresting defendant to have "trespassed" on H & S Manufacturing Company property, thus creating the situation on which defendant relies so greatly in pressing his motions to suppress.

I refer to cases and the evidence generally which, in my opinion, demonstrate the general lack of merit in these contentions. It is obvious that Brookside Drive is a public

thoroughfare, either through dedication or public use, the paved portion of which is maintained by the State and I cannot liken the area to anything other than "open space" or "open field". Since defendant's car was found parked in such "open space"—and at least some portion of the car was obviously on the public thoroughfare, I regard as a matter of fact of law and find and conclude that defendant's car was not "parked" on property of H & S Manufacturing Company but was in "open space" and the case is governed by the *Hester* case discussed *post.*

All this physical evidence taken from defendant or his car was discussed by the police officers at defendant's prior trial and the parking stub and at least one item taken from the folder were introduced into evidence and given to the jury. Other information garnered by both the City and State Police and William D. Forestieri, Jr. was referred to in the trial record.

It is contended this evidence was illegally obtained and resulted from an "illegal trespass" on the property of H & S Manufacturing Company, and defendant proposes that under this motion to suppress the Court should suppress any and all evidence and/or information garnered subsequent to what he terms a "trespass" on the H & S property, as illegally obtained evidence from defendant, and to limit the testimony of all witnesses to those matters free of the taint of illegally obtained evidence and thus accord the defendant the type of trial which is guaranteed to him by both the Federal and State Constitutions.

Extensive hearings were held on defendant's motion to suppress and because of what was supposedly developed at one of these hearings defendant filed his second motion to suppress on June 5, 1962, contending therein that the actions of the officers on the early morning of October 18, 1959 amounted to no more than a "detention"—and not an arrest

—and what they did in searching defendant's car and his person during such "detention" was illegal, and in its course they obtained the items of evidence heretofore identified; that it was an illegal search and seizure, in violation of his Constitutional rights under the State and Federal Constitutions.

I find it difficult to comprehend defendant's contentions and I seriously doubt my power to now even consider—much less rule—contrary to what was determined by the Supreme Court of this State when it previously considered this case and ruled as reported in 4 Storey 180, 175 A. 2d 42, at page 46. Defendant is still contending that defendant was not "abroad" and so he could not be "detained" or "arrested" and his car could not be "searched" except under a warrant of some kind, as provided by the Uniform Arrest Act.

Our Supreme Court expressly ruled, 175 A. 2d at page 47:

"* * * When, as here, a police officer sees for himself a driver dead drunk at the wheel of his car, under circumstances indicating that the car has recently been operated and he is assured by another driver that the man at the wheel had actually been driving, we are of opinion that the arrest is made for a violation 'on view' within the meaning of the statute."

I note that in the opinion, the Supreme Court further ruled:

"Since the detention and arrest was lawful, it follows that the search of the car was lawful."

Defendant's main thrust, in seeking to establish a differentiation of what he asserts under his motions to suppress, from his seeming comprehension of the Supreme Court's holding, is based on his ideas that a "trespass" on the property of H & S Manufacturing Company was involved by the officers in going to and entering defendant's car for inspection, and in making the "detention", and the "arrest", and the

"search"; matters which he would have this Court believe were not considered by the Supreme Court, notwithstanding the clear language of the opinion.

All these points, it appears to me, were before the Supreme Court and considered, all as contended by the State in its brief filed on these motions to suppress, since it is a matter of record that defendant had presented and argued these contentions before the Supreme Court on the appeal from his first conviction; all of this being quite clear from a reading of the opinion.

At page 29 of his brief filed with the Supreme Court, following the first conviction, defendant argued to the Supreme Court that—

"The two-hour detention provisions of the 'Uniform Arrest Act' are not applicable. First, there is no showing that the defendant was 'abroad' within the meaning of that statute. Conceding arguendo that 'abroad' could include being in an automobile on the public highway, there is *no showing here that the defendant was parked anywhere but on his own property in front of his small industrial plant.*" (Emphasis supplied.)

Thus, it is clear the Supreme Court had before it for consideration and then determined the effect to be given to the "detention" and "arrest"—made on property of defendant's manufacturing plant, as well as the ensuing search, and the Court saw fit to reject the argument,—that there was a "trespass."

Is it now for the Superior Court to review the Supreme Court's rejection of these contentions and rule this constituted "error" on the part of the Supreme Court? The answer to this question is obvious from merely posing the question.

It is quite apparent from the Supreme Court's language that it was settling all issues before it because it appears, 175 A. 2d at page 44, the Supreme Court said:

"* * * As will later appear, the case must go back for retrial on the first two charges because of error in this matter. *But on the retrial defendants will probably renew some of the points now before us. Hence, for the guidance of the trial court, we shall rule upon certain of these objections, although several of them were not even made at the trial.*" (Emphasis supplied.)

In using this language, it is obvious to me that the Supreme Court intended to and disposed of the contentions and did consider every contention raised before it by defendant so that the issues decided by it would be binding upon defendant at the new trial.

Whether in fact defendant was or was not parked in part on property of H & S Manufacturing Company, the only allegation before the Supreme Court was that he *was*, and it seems quite clear to me that the Supreme Court made short shrift of defendant's argument that the Uniform Arrest Act was not applicable by saying, 175 A. 2d at page 46, as follows:

"We have had occasion to consider the provisions of the Uniform Arrest Act (11 *Del. C.* § 1902) in recent cases. *De Salvatore v. State,* [2 Storey 550, 52 Del. 550], 163 A. 2d 244; *Cannon v. State,* [3 Storey 284], 168 A. 2d 108. Its provisions are clearly applicable to the case before us. A driver of a motor vehicle complains to the police that another driver, apparently intoxicated, has collided with his car * * *. At two o'clock in the morning the police find that driver in his car, slumped over the wheel unconscious with the lights on. *The car is in front of his office or business premises;* not his home. To hold that he was not 'abroad' within the meaning of the statute would be to emasculate it. To say that the driver is immune from detention under the statute because he has made himself too drunk to understand or answer the statutory questions approaches the absurd." (Emphasis supplied.)

■ The language of the last sentence answered defendant's claim that the officers did not ask the statutory questions specified in 11 *Del. C.* § 1902(a). This statement *immediately follows* the language quoted above from defendant's appeal brief concerning the meaning of "abroad" and is further proof that the Supreme Court weighed every fact and allegation before it arrived at its decision, which was that "* * * The officers were clearly justified in detaining the defendant." (175 A. 2d p. 46) and it would follow that the subsequent taking into custody was the "arrest" which justified the search of defendant's person and his car. All of these acts were justified under the Uniform Arrest Act.

■ The Supreme Court's ruling clearly disposed of defendant's contention raised here again that the detention, arrest and search were unlawful, in that all of the facts, including the allegation that defendant was "parked * * * in front of his small industrial plant", were before the Supreme Court, which definitely passed on the questions. The cited Act was held applicable, therefore, under Delaware law evidence obtained as shown to be the case here is admissible. *Cannon v. State,* 3 Storey 284, 168 A. 2d 108 (1961); *State v. Smith,* 8 Terry 334, 47 Del. 334, 91 A. 2d 188 (1952).

It is in no way appropriate for me—in light of the Supreme Court's rulings—to now hold that a person parked on a street bed in a car before a business property in which he has 100% stock control is not "abroad" within the meaning of the Uniform Arrest Act. If I were to be so brash as to ignore the rulings of the Supreme Court, and rule as defendant desires, the result would be an emasculation of that Act— a holding that would thwart the very purpose of the Act.

Defendant closes his eyes to the facts that were developed in the first trial of the case and seeks to escape the effects of what he did on the night in question by arguing a highly technical and insubstantial point.

I say it is highly insubstantial and technical because the evidence adduced in the hearings never convinced me that defendant proved his factual thesis,—that his car's position was such that a trespass had to be committed by the officers if they performed their duties, as has heretofore been noted. No witnesses—or the totality of the witnesses—by the believable evidence ever convinced me that defendant's car was located in the position counsel would have me believe it was; there were discrepancies between and disagreements in the testimony of defendant's own witnesses. I cannot and do not believe any witness could or did fix the position of the defendant's car on the early morning of October 18, 1959. Everybody who testified was seeking to recall an event and the position of a car—then of no significance—as it was found in October of 1959, some 2½ years before. To me the hearings were wholly unproductive, as far as defendant was concerned; I find no trespass because the car's position was of no concern to any witness on October 18, 1959 and when defendant sought to make it a matter of importance in June of 1962 each witness was—at best—only guessing as to what he observed some 2½ years before as to the car's position on the early morning of October 18, 1959. I am forced to and do disregard all such testimony because it does not rise to the dignity of aiding defendant to meet the burden of proof. He did not prove a trespass; to say the most in defendant's behalf, he showed only it was possible there could have been a "trespass"—not that there was.

Where the facts in proceedings following a determination of a case by an Appellate Court are substantially the same as those on the first trial, the decision of the Appellate Court on all matters, questions, points or issues adjudicated is the law of the case in further proceedings in the cause in the Trial Court, and in all subsequent stages of the proceeding, including subsequent appeals. This is what is known as and frequently stated to be "the law of the case".

This rule applies whether the judgment is reversed and remanded or affirmed. The rule is applied regardless of whether the determination of the Appellate Court is right or wrong. It is the duty of the lower Court to follow the decision of the Appellate Court, any other action being deemed erroneous when at variance with the decision of the Appellate Court. Matters once determined by the Appellate Court cannot, after remand, be again raised and relitigated in the lower Court. The rule applies to and comprehends all matters properly within the scope of the appeal, all points presented and decided and necessarily involved therein and all matters decided by necessary implication. 5B *C. J. S.* Appeal and Error § 1964, pages 550, 559; 21 *C. J. S.* Courts § 195. See also 3 *Am. Jur.* §§ 985/994, pages 541/549; 5 *Am. Jur.* 2d, §§ 744/748, pages 188/193; *State ex rel. Richards v. Brooks*, 1 Boyce 129, 74 A. 599, 601 (1909); *Ajax Rubber Co. v. Gam*, 4 W. W. Harr. 264, 269, 151 A. 831 (1924); *Gibson v. Trustees of Pencader Presbyterian Church*, 25 Del. Ch. 317, 20 A. 2d 134, 138 (1941) and see also *Elster v. American Airlines, Inc.*, 34 Del. Ch. 94, 100 A. 2d 219 (1953); 34 Del. Ch. 505, 106 A. 2d 516 (1954); Del. Ch., 148 A. 2d 343 (1959); *Beard v. Elster*, Del. Ch. 160 A. 731 (1960); *Elster v. American Airlines, Inc.*, Del. Ch., 167 A. 2d 231, 236 (1961).

Assuming for the moment defendant adduced evidence making it appear that a "trespass' had been committed by the officers in arresting defendant, nevertheless I still would be constrained to deny defendant's motions to suppress. In *Giacona v. United States*, 257 F. 2d 450 (5th Cir., 1958); cert. denied 358 U. S. 873, 79 S. Ct. 113, 3 L. Ed. 2d 104 (1958), the Court of Appeals held, at 257 F. 2d page 456:

"When the performance of his duty requires an officer of the law to enter upon private property, his conduct, otherwise a trespass, is justifiable. 52 *Am. Jur.*, Trespass, § 41. In any event, *evidence is not rendered inadmissible merely be-*

*cause it has been obtained by a simple trespass upon land.* (Emphasis supplied) The protection of the Fourth Amendment is not that extensive: "The right of the people to be secure in their persons, *houses,* papers, and effects, against *unreasonable* searches and seizures, shall not be violated. * * *' " (Emphasis supplied by the Court.)

This distinction between a trespass upon land and a trespass into a man's house, a building or confine is emphasized by the Court of Appeals in *Giacona,* 257, F. 2d at page 456, where the Court further stated:

"The Fourth Amendment protects against *'unreasonable* searches and seizures.' Reasonableness is often a question of degree as to 'when the right of privacy must reasonably yield to the right of search.' *Johnson v. United States,* 1948, 333 U. S. 10, 14, 68 S. Ct. 367, 369, 92 L. Ed. 436." (Emphasis supplied by the Court.)

The Court of Appeals in *Giacona* cited *Hester v. United States,* 265 U. S. 57, 59, 44 S. Ct. 445, 446, 68 L. Ed. 898 (1924), wherein Justice Holmes ruled:

"* * * the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 *Bl. Comm.* 223, 225, 226."

In the *Hester* case, defendant was convicted of concealing distilled spirits. On information received, revenue officers went onto land owned by defendant's father (defendant lived there also) and as they approached the house they saw a man drive in. They concealed themselves and observed consummation of an illicit sale of whiskey. These officers were detected and all the parties fled, dropping bottles and jugs as they ran. The officers had no warrant for search or arrest. It was contended that this made their evidence inadmissible,

since they admitted that they were on defendant's land. The Supreme Court of the United States held, 265 U. S. 57, 58, 44 S. Ct. 445, 446, 68 L. Ed. 898:

"* * * It is obvious that even if there had been a trespass, the above testimony was not obtained by an illegal search or seizure. The defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle—and there was no seizure in the sense of the law when the officers examined the contents of each after it had been abandoned. This evidence was not obtained by the entry into the house and it is immaterial to discuss that. The suggestion that the defendant was compelled to give evidence against himself does not require an answer. The only shadow of a ground for bringing up the case is drawn from the hypothesis that the examination of the vessels took place upon Hester's father's land."

The Supreme Court of the United States then laid down the rule as to the distinction between protection of the house and open fields as set forth above and I cannot find this *Hester* case has ever been overruled.

Seemingly as late as March 1960, the United State Supreme Court cited it with approval in *Abel v. United States*, 362, U. S. 217, 241, 80 S. Ct. 683, 698, 4 L. Ed. 2d 668, at p. 687. As recently as March 6, 1961, in *Silverman v. United States*, 365 U. S. 505, 512, 81 S. Ct. 679, 683, 5 L. Ed. 2d 734, the Supreme Court very carefully noted:

"* * * This Court has never held that a federal officer may without warrant and without consent physically entrench into a man's office or home * * *."

The Court did not include a field or a drive within the compass of its holding that the Fourth Amendment would be applicable.

The United States Courts of Appeal still follow the dis-

tinction made in *Hester*. See *Feguer v. United States*, 302 F. 2d 214, at page 249 (8th Cir., 1962); *Monnette v. United States*, 299 F. 2d 847, 850 (5th Cir., 1962); *United States v. Benson*, 299 F. 2d 45, 46 (6th Cir., 1962); *Foster v. United States*, 296 F. 2d 65, 67 (5th Cir., 1962).

In the *Monnette* case, the defense had argued there had been an illegal search because in procuring the information on which a search warrant later had been obtained that an agent had gone on defendant's grounds to make his observations and this, the defense, argued, constituted a trespass which vitiated the search warrant. The Court of Appeals said, 299 F. 2d at 850:

"* * * It is well settled, however, that a trespass upon the grounds surrounding a building does not constitute an illegal search. The protection of the Fourth Amendment does not extend to the grounds. * * *"

The *Hester* case is cited as authority.

The *Foster* case, *supra*, is to like effect. There the defense contended there had been a trespass by federal agents which afforded him a defense to the charges. It appeared that F. B. I. agents went on the porch of the home of defendant's parents. Thereafter and before the agents went into the house the defendant obtained a rifle and ordered the agents off the premises. Some further discussion then ensued before Foster and the agents; this was said to be the trespass since the agents did not immediately leave the porch. The Court of Appeals said, 296 F. 2d 65, 67:

"* * * We proceed, therefore, on the premise that the original approach, the knocking at the door, the inquiry of appellant as to his identity, were all actions which were protected under the principle that 'when the performance of his duty requires an officer of the law to enter upon private property,

his conduct, otherwise a trespass, is justifiable.' See *Giacona v. United States*, 5 Cir., 257 F. 2d 450, 456, and see 52 *Am. Jur.*, Trespass, Sec. 41.

"The narrow question then arises whether the period of time, variously testified to as being from a few seconds to a minute, during which one of the agents made one further effort to identify himself to Foster and to request a brief audience with him, and to enable Foster to turn and walk to the front door and pick up the gun and aim it at the agents, constituted a sufficient lapse of time so that what had theretofore been a legal act of standing on the front steps was converted into a trespass. Obviously once the gun was pointed at the agents their continued presence, while expostulating with Foster, rather than turning their backs on the gun and departing, could not of itself have changed the quality of the threat already made when Foster pointed the gun at them in the first place.

"The appellant seeks to equate what he characterizes as a trespass resulting from the agents' failure to turn and leave without even attempting to identify themselves with an arrest without a warrant or an unreasonable search or seizure of a home without a search warrant. As has been pointed out by this Court in the *Giacona* case, *supra,* there is a clear distinction between a simple trespass upon land and an unreasonable search of a person or his house or an unreasonable seizure of his papers and effects as protected against by the IV Amendment to the Federal Constitution. In this connection we think the language of Mr. Justice Holmes is apposite when, speaking for the Supreme Court in *Hester v. United States*, 265 U. S. 57, 44 S. Ct. 445, 446, 68 L. Ed. 898, he said:

" 'The special protection accorded by the Fourth Amendment to the people in their "persons, houses, papers and effects" is not extended to the open fields. The distinction be-

tween the latter and the house is as old as the common law. 4 *Bl., Comm.* 223, 225, 226'."

See also *Martin v. United States*, 155 F. 2d 503, 505 (5th Cir., 1946) and *Edwards v. United States*, 206 F. 2d 855, 856 (10 Cir., 1953). See further the discussions in *Brinegar v. United States*, 338 U. S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949) and *Draper v. United States*, 358 U. S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959), and compare *Henry v. United States*, 361 U. S. 98, 80 S. Ct. 168, 4 L. Ed 2d 134 (1959), in which case the Court noted that the F. B. I. agents had no information implicating Pierotti in any thefts and so had no "probable cause" to believe a crime had been committed and so could not make the arrest which had been attacked by the defense in that cited case. The Supreme Court of the United States characterized as "rumor" such information as the F. B. I. agents had about Pierotti's implication in the case and ruled it could not be the basis of the "arrest". The facts in the case *sub judice* are so different that it appears quite clear the officers had "probable cause" in arresting Mr. Halko in light of all circumstances.

I do not overlook the valiant efforts of defendant's able counsel to so strenuously contend there was a "trespass" and to attack the *Hester* ruling as he did, but I cannot find language in any subsequent opinion of the United States Supreme Court that overrules the *Hester* case or from which it follows that when officers find a person in the condition and under the circumstances that appear so clearly as here, an arrest and search is "unreasonable" so as to violate the Fourth Amendment to the Federal Constitution. I see no difference between an incursion into "open fields" and an entry into an automobile parked on a public thoroughfare, even if some third person may have some rights in some small portions of the street bed of such thoroughfare.

It is set forth in 79 *C. J. S.* Searches and Seizures § 14:

"As a general rule, land and buildings outside the curtilege are not protected from unreasonable searches and seizures."

In the discussion under this section it is said that the protection against unreasonable searches and seizures does not "protect a roadway". *State v. Ladue*, 73 Mont. 535, 237 P. 495 (1925); *People v. Ring*, 267 Mich. 657, 255 N. W. 373, 93 A. L. R. 993 (1934) and *People v. Montes*, 146 Cal. App. 2d 530, 303 P. 2d 1064 (1956) are cited to support the statement of law.

In the *Ladue* case the arresting officer was on a road, about 10 feet away from a building in which defendant was operating a still and he saw the still in operation when defendant opened the door, after which he went to the building and made the arrest and ensuing search. The Montana Supreme Court said (237 P. at 496):

"The evidence, therefore, shows that, independent of the search warrant, and without a search made by virtue thereof, the officers observed the law being violated in their presence, so that, whether or not in the instant case they had a valid search warrant, or any warrant at all, is of no importance. The officers were, under these circumstances, justified in seizing the articles used in violating the law.

"Counsel for defendant contends, however, that the entry upon the lands of defendant 'under the guise of an invalid search warrant,' and the progress of the officers across the land to a position where they could observe what was going on, and thereupon seizing the articles, constitutes a violation of defendant's constitutional guaranty against unreasonable searches and seizures. There is no merit in this contention. While the officers may have committed a technical trespass, the protection afforded by the constitutional guaranty extends only to the subject-matter of the provision. Section 7, art. 3, of our Constitution, provides:

" 'The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures. * * *'

"An entry without search is not prohibited, and an open field or roadway is not embraced within any one of the terms 'persons, papers, homes and effects.' The above section differs from the Fourth Amendment to the federal Constitution only in the use of the word 'homes' in place of 'houses.'

"In the case of *Hester v. United States*, 265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898, a like contention was made. The facts disclosed in that case are that the officers secreted themselves in a field adjacent to Hester's house; a car drove up and Hester took a jug therefrom; an alarm was given, and Hester fled, but dropped the jug; the jug broke, but still retained about a quart of its contents, which the officers found to be moonshine whiskey. The Supreme Court said:

" 'It is obvious that, even if there had been a trespass, the above testimony was not obtained by an illegal search and seizure. * * * It is enough to say that, apart from the justification, the special protection accorded by the Fourth Amendment to the people in their "persons, houses, papers, and effects" is not extended to open fields. The distinction between the latter and the house is as old as the common law. 4 *Bl. Comm.* 223, 225, 226.' "

Attention is called to language appearing in Mr. Justice Clark's dissent in *Henry v. U. S.*, 361 U. S. 98, 106, 80 S. Ct. 168, 173, 4 L. Ed. 2d 134, 141 (1959) where he said:

"When an investigation proceeds to the point where an [officer] has reasonable grounds to believe that an offense is being committed in his presence, he is obligated to proceed to make such searches, seizures, and arrests as the circumstances require. It is only by such alertness that crime is discovered, interrupted, prevented, and punished. We should not place additional burdens on law enforcement agencies."

In light of the foregoing holdings *the officers were required* under the facts that had been made known to them to perform their duties, and to open the car door of defendant's automobile—since some or even all of it was parked on an apparent open street (assuming even that some property rights in a part of the street were vested in H & S Manufacturing Company) and take defendant into custody.

These officers had been called to investigate a driving of an automobile by a person said to be under the influence of intoxicating liquor. The car was pointed out to them by the complaining witness. Without opening the door they could observe, "upon view", defendant was unconscious—dead drunk—slumped over the wheel, with a bottle in plain sight between his legs. They could observe that the car headlights were on.

As Chief Justice Southerland observed: "How did the car get there? It was a reasonable inference that he drove it there" (175 A. 2d at page 46). As stated earlier, the officers had been informed that defendant had been driving the car in which he was found. Thus, without even opening the door, the officers were justified in making an arrest, "upon view".

In the *Ring* case, *supra,* officers had observed naked people in a nudist camp from adjoining property, whereupon they went into the nudist camp and made the arrests. It was contended that defendant's immunity against unlawful searches had been denied him. Defendant was convicted and appealed. In disposing of the point of unlawful search the Michigan Supreme Court said (255 N. W. at 374):

"The rule stated in *People v. Marxhausen*, 204 Mich. 559, 171, N. W. 557, 3 A. L. R. 1505, has never been disturbed. Is, however, a nudist camp the defendant's home or castle? We need not repeat the reasoning of the case cited, nor indulged in what might easily be a lengthy discussion of the situation here. While there is no case directly in point in

our reports, there is little difficulty in finding respectable authority elsewhere. The curtilage is immune to unreasonable search and seizure, but there is drawn a distinction between the right of peace officers to invade the privacy of one's house and the right to invade one's lands. An open field or roadway is not embraced within the terms of the constitutional prohibition. The obvious intent of the Constitution is to protect the individual in the peaceful enjoyment and occupation of the house in which he lives, the place in which he earns his livelihood and the things connected therewith, and to prevent an unlawful disturbance of his privacy and person. In our ever-changing civilization, it is both difficult and unwise to define the term 'curtilage' with exactitude.

"That the Constitution does not guarantee the privacy of open lands was held in *Hester v. United States*, 265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898. Our conclusions are also influenced by our study of the following cases: *State v. Ladue*, 73 Mont. 535, 237 P. 495; *United States v. McBride* (D. C.) 287 F. 215; *Schnorenberg v. United States* (C. C. A. [7] 23 F. (2d) 38; *Worth v. State*, 111 Tex. Cr. R. 288, 12 S. W. (2d) 582; *Brent v. Commonwealth*, 194 Ky. 504, 240 S. W. 45; *Dulek v. United States* (C. C. A. [6]) 16 F. (2d) 275; and *Koth v. United States* (C. C. A. [9] 16 F. (2d) 59."

In the *Montes* case, *supra*, the agents—who suspected defendant of possession of marijuana—had driven into defendant's driveway and found persons there with marijuana in cars. Some of the persons threw the drug out when approached by the officers and the officers found packages of the drugs in others cars in this driveway. In its determination of the case the Appellate Court of California said:

"Entry upon a field or a driveway is not an unlawful search forbidden by the Fourth Amendment. *Hester v. U. S.*, 265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898; *Martin v. U. S.*, 5 Cir., 155 F. 2d 503; *People v. Martin*, 45 Cal. 2d 755, 290 P. 2d 855. * * *"

In the *Martin* case cited above, the Supreme Court of California upheld a search and a seizure of gambling paraphernalia that had been observed by officers standing on the outside of a building looking through the windows of a defendant's office located on Ventura Boulevard in Los Angeles.

The California Supreme Court, after referring to a prior arrest of defendant for a like offense, noted (290 P. 2d at page 858):

"On the second occasion, six days later, the same officers looked through the rear window of another small office building. A blackboard, chalk, and a rag were visible, and the door was barricaded by two two-by-twelve planks. Although it does not appear that the officers observed telephones or a scratch sheet from the window, the presence of the other paraphernalia together with barricades similar to those found at the time of the first arrest justified their conclusion that these premises were also a 'relay spot.' Moreover, since the barricades were in place, they could reasonably infer that someone was present and that an offense was therefore being committed in their presence."
The Court then ruled (*Id.*):

"Since looking through a window does not constitute an unreasonable search, *Safarik v. United States*, 8 Cir., 62 F. 2d 892, 895; *Smith v. United States*, 4 Cir., 2 F. 2d 715, 716; *United States v. Strickland*, D. C., 62 F. Supp. 468, 471; *State v. Hawkins*, 362 Mo. 152, 240 S. W. 2d 688, 692-693; *People v. Exum*, 382 Ill. 204, 47 N. E. 2d 56, 59; see also, *United States v. Lee*, 274, U. S. 559, 563, 47 S. Ct. 746, 71 L. Ed. 1202, the officers were entitled to act upon what they saw and arrest defendant. * * *"

Assuming a contention advanced by defendant that the officer's entrance into the office by raising the window was illegal, the California Court said (290 P. 2d at p. 859):

"* * *, even if it is assumed that raising the window was unlawful, on the ground that it occurred before the request for admittance, such illegality, if any, is immaterial in this case. Before the window was opened the officers had grounds for making an arrest, and once their demand for admittance was refused, they were entitled to enter through the window. Under these circumstances, the fact that one of the officers opened the window and then spoke to defendant rather than shouting through it or the door, was entirely unrelated and collateral to the entry and to the securing of the evidence to which defendant objects, and it could not therefore render that evidence inadmissible. * * *"

The Supreme Court of this State ruled on the previous appeal that where there is a lawful arrest, a search of the car is also lawful, *State v. Halko*, 5 Storey 385, 175 A. 2d 46. In one of his briefs filed in the present proceeding defendant, however, cites the case of *Trupiano v. United States*, 334 U. S. 699, 68 S. Ct. 1229, 92 L. Ed. 1663 (1948), wherein a search made incidental to a lawful arrest was ruled illegal due to the arresting officers' failure to obtain an appropriate search warrant and argues from it there was "illegal search". It is apparent, upon reading this case, that the Court's opinion was based upon the fact that it would have been feasible for the officers to have gone to a magistrate and obtained a search warrant and the Supreme Court of the United States ruled that this should have been done.

As it was said by the United States Supreme Court at 334 U. S. at p. 708, 68 S. Ct. at 1234, 92 L. Ed. 1663:

"* * * In the case before us, however, no reason whatever has been shown why the arresting officers could not have armed themselves during all the weeks of their surveillance of the locus with a duly obtained search warrant—no reason, that is, except indifference to the legal process for search and seizure which the Constitution contemplated."

The ruling of this *Trupiano* case was later, however, completely disposed of by the case of *United States v. Rabinowitz*, 339 U. S. 56, 70 S. Ct. 430, 94 L. Ed 653 (1950) where at 339 U. S. p. 65, 70 S. Ct. 435, 94 L. Ed. 653, the Supreme Court of the United States said:

"It is appropriate to note that the Constitution does not say that the right of the people to be secure in their persons should not be violated without a search warrant if it is practicable for the officers to procure one. The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. It is not disputed that there may be reasonable searches, incident to an arrest, without a search warrant. Upon acceptance of this established rule that some authority to search follows from lawfully taking the person into custody, it becomes apparent that such searches turn upon the reasonableness under all the circumstances and not upon the practicability of procuring a search warrant, for the warrant is not required." (Emphasis by the Court)

Continuing, the Supreme Court of the United States then (*Id.*) specifically overruled the *Trupiano* case, as follows:

"* * * To the extent that *Trupiano v. United States*, 334 U. S. 699, 68 S. Ct. 1229, 92 L. Ed. 1663, requires a search warrant solely upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, *that case is overruled.*" (Emphasis supplied) The United States Supreme Court then stated that the real test is not whether it is reasonable to get a warrant but, instead, whether the search itself is reasonable. This depends "upon the facts and circumstances—the total atmosphere of the case." (339 U. S. at p. 66, 70 S. Ct. at p. 435, 94 L.Ed. 653). This ruling also disposed of *Taylor v. United States*, 286 U. S. 1, 52 S. Ct. 466, 76 L. Ed. 951 (1932), in that the decision was based upon the reasonableness of procuring a search warrant.

Since there was a lawful "detention" and "arrest" in our case, it is inconceivable that the search of the automobile incident to such arrest, would be invalid as "unreasonable". Defendant was found "dead drunk" in his car, slumped over the steering wheel, in the early morning of October 18, 1959, ostensibly parked on an open drive or road. The fact that the H & S Manufacturing Company may have had some technical rights in a relatively small proportion of the bed of Brookside Drive is not, in my opinion, of significance so as to have required the officers to obtain a warrant to "arrest" or a "search warrant" to open defendant's car, parked as it was.

As a matter of fact, even though the test is whether it was reasonable to procure a warrant, I hold that defendant may not now raise this issue since the Supreme Court of this State in *State v. Halko, supra,* expressly ruled that it would have been unreasonable to require the officers to procure a search warranty where there was a lawful arrest, 4 Storey 180, 175 A. 2d 46. Thus, the search of the automobile incident to the arrest was valid and the evidence procured is admissible in the event of a further trial of defendant on the charges made against him.

For the reasons stated the motions to suppress are denied. An order may be presented to this effect.