WILLIAMS *v.* STATE OF INDIANA.

[No. 30,712. Filed December 29, 1966.]

*John G. Bunner*, of Evansville, for appellant.

*John J. Dillon*, Attorney General and *James Manahan*, Deputy Attorney General, for appellee.

ARTERBURN, C. J.—There being only four judges as members of this Supreme Court at the present time since the recent resignation of Achor, J., Rakestraw, J. and Arterburn, C. J. are of the opinion that the decision of the trial court should be affirmed, while Myers and Jackson, JJ. are of the opinion that the decision of the trial court should be reversed and the appellant granted a new trial.

The four judges participating being equally divided at the last term of court (Achor, J. not then participating), and being still equally divided at this term, the judgment of the trial court is affirmed without costs.

Acts 1881 (Spec. Sess.), ch. 38, § 654, p. 240, being Burns' Ind. Stat. Anno. § 2-3232 (1946 Repl.).

The separate opinions covering the material points in issue arising from this appeal are as follows:

### SEPARATE OPINION

MYERS, J.—This is an appeal from a judgment of the Vanderburgh Circuit Court wherein appellant was convicted of the crime of robbery. An amended affidavit charging appellant with robbery was filed March 5, 1964. A motion to suppress the evidence was filed on the same day. It was overruled on June 25, 1964, after evidence was heard thereon. In the meantime, appellant waived arraignment, entered a plea of not guilty, and requested trial by jury which was granted. On September 28, 1964, trial was commenced before a jury,

which was discharged after both appellant and the State waived trial by jury. Trial was concluded on October 1, 1964, before the court which found appellant guilty as charged on October 8, 1964. He was sentenced to a term of ten to twenty-five years at the Indiana Reformatory and was disfranchised for a period of ten years. Motion for a new trial was timely filed and overruled on November 12, 1964. This appeal followed.

The assignment of error is based upon the overruling of the motion for new trial. The grounds of the motion are that the finding of the court is contrary to law and not sustained by sufficient evidence; that the court erred in overruling appellant's motion to suppress the evidence; that there were errors of law committed during the trial in regard to the admission of certain testimony and the introduction of certain evidence.

The principal contention raised by appellant in this appeal is that certain evidence was erroneously admitted by the trial court which allegedly was acquired in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Art. 1, § 11, Art. 1, § 12, Art. 1, § 13, and Art. 1, § 14, of the Indiana Constitution. The pertinent section involved herein is the Fourth Amendment to the United States Constitution which reads as follows:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The facts most favorable to appellee are to the effect that appellant was driving alone in a 1957 Chevrolet automobile about 3:30 or 4:00 p. m. on February 28, 1964, upon U. S. Highway 70, approaching Memphis, Tennessee. There were Illinois license plates on his car. He claimed that he had

driven from Chicago and was headed for the State of Louisiana.

On that day, two State Troopers of the Tennessee Highway Patrol were on duty patrolling the highways. In carrying out their duties, they stopped numerous drivers to inspect their drivers' licenses. When assigned to road patrol they did this regularly every day. At 4:00 p.m. they had stopped fifteen or twenty automobiles without regard to their license plates, where they came from, or whether the drivers were white or colored. Such inspection was indiscriminate and a mere matter of routine. They saw appellant driving west on U. S. 70, and, for no other reason than to check his driver's license, followed him with their red light on until he stopped outside the city limits. They drove their police car directly in front of his at the curb. Both troopers, being in uniform, got out of their car at the same time appellant opened the door of his car and stepped out on the driver's side. They stood there by his left front fender while they asked him to produce his driver's license. He searched his pockets and could not find it. Then he asked if he could go back to his car and look for it, saying it could be in the car or his coat which was lying inside. One officer followed him to the driver's side when he got in, while the other officer walked around to the other side for security reasons. Appellant sat under the steering wheel on the driver's side and started to look for his license in the glove compartment. When he opened it there were some papers in it and two Ten Dollar bills. He could not find his license. At that time the officers told him they were going to have to take him uptown, charge him and arrest him for failure to have a driver's license, and that one of the officers would take his car back to their station. The reason for this was that they were responsible for his car if they arrested him. They wanted it in a safe and secure place and not left sitting on the side of the road. There were no facilities at the county jail for storing an automobile.

In the meantime, while appellant was seeking his license,

the other officer looked under the right seat of appellant's car and saw a shaving kit which had money sticking out of it. He could see the ends which were "kind of ruffled up," with a rubber band around them. It appeared to be a considerable sum of currency, consisting of bills of five to twenty dollars' denomination. The officer took it out of the car and brought it around to show it to his fellow trooper. They asked appellant where he got the money. He answered that he won it in a gambling casino at "Las Vegas, California." With that, they placed handcuffs on appellant and put him in the patrol car. One officer drove him to State Police Headquarters, while the other officer followed in appellant's car. The shaving kit and money had been placed back in appellant's car on the seat behind the driver. Upon arriving at State Police Barracks, they all got out and took the shaving kit into a small office where they proceeded to count the money therein. Appellant was present at all times. It turned out there was a total sum of $4,865.51 stuffed in the kit.

In counting the money, they found some currency with bank wrappers around it designated as having come from the Old National Bank in Evansville, Indiana. At that, the FBI was called in and agents thereof questioned appellant. At length, appellant stated to members of the Memphis Police Department that he had hit and robbed a man who was making a night deposit in the Old National Bank at Evansville. He signed a statement to this effect.

Later, he was driven to the Memphis County Jail. It was learned then that there had been no such robbery in Evansville, but that appellant was wanted there in connection with a holdup at the Penny Can Market, Inc., where some shots were fired in the process. He eventually signed a second confession in which he admitted to having held-up a man in the office of the Supermarket at gunpoint on February 19, 1964, taken money from him and run after shooting through a glass door. An affidavit charging appellant with armed robbery in Indiana was signed by one of the Tennessee State Troopers,

and a fugitive warrant was issued thereon. He was booked for armed robbery and placed in jail. After a hearing in court, he waived extradition and surrendered himself to Evansville police officers who took him back to Evansville. Subsequently, he was tried and convicted there of robbery.

The motion to suppress filed prior to trial pertained to the money found in the shaving·kit taken from appellant's automobile, the bank wrappers, other papers and belongings which were alleged to be the fruit of an illegal search and seizure of appellant and his property which, it was stated, appellee intended to use as evidence against appellant in the trial of the cause. This motion was overruled.

At the trial, appellant continued to object to the introduction of these items, as well as the confessions of appellant, for the same reason among others. These objections were overruled and the evidence was admitted.

In argument, appellant contends error was committed in overruling these motions on the ground that he was deprived of his fundamental constitutional rights. He says that, in the first place, his arrest was illegal since it was made without a warrant; that the officers had no probable cause to believe he had committed a felony; that they had seen no misdemeanor committed in their presence so as to be empowered to make an arrest without a warrant.

As a general rule, a police officer has no authority to make an arrest without a warrant unless he has seen a crime committed in his presence, such as a felony or a misdemeanor, or has probable cause to believe that a felony has been committed. This is the law not only in Indiana, but in the State of Tennessee and under Federal decisions. *Brown* v. *State* (1951), 229 Ind. 470, 99 N. E. 2d 103; *Robertson* v. *State* (1947), 184 Tenn. 277, 198 S. W. 2d 633; *Henry* v. *United States* (1959), 361 U. S. 98, 80 S. Ct. 168, 4 L. Ed. 2d 134. See 5 Am. Jur. 2d, *Arrest,* § 22 et seq., pp. 711 et seq.

If the arrest is unlawful from its inception, any search

or seizure pursuant thereto is unreasonable and in violation of constitutional rights. *Brown* v. *State, supra.*

In this case, it was admitted by the officers that they had no warrant for appellant's arrest; that they had no search warrant authorizing them to search his car; that he was not speeding, nor violating any traffic law, nor committing any misdemeanor in their presence; that they had no information when they stopped him that would cause them to believe he had committed a felony or that he was a fugitive from justice. Taken altogether, this would certainly indicate that an unlawful arrest had been made. One of the officers made the statement that in checking drivers' licenses, "we just stop a car any time we want to." Without any reason other than that, such stopping would be an invasion of a citizen's constitutional rights.

It is commonly held that the law of the place of arrest determines its validity. *Miller* v. *United States* (1958), 357 U. S. 301, 78 S. Ct. 1190, 2 L. Ed. 2d 1332. In *Robertson* v. *State, supra* (at page 284 of 184 Tenn., at page 635 of 198 S. W. 2d), the Supreme Court of Tennessee held that the stopping of an automobile is in fact an arrest, "even though it be a momentary one in some cases."

However, Tennessee has a statute which permits a state patrolman to stop an automobile on the highway and demand from the driver an exhibition of his driver's license. Tenn. Code Ann., § 59-709. Whether or not this statute is an invasion of a citizen's constitutional rights is not a matter for this court to determine, since that is for the judiciary of the sovereign State of Tennessee. Assuming that Tennessee State Patrolmen are empowered by law to stop a car on the highway for driver's license inspection, and that such constitutes a valid arrest within the holding of the *Robertson* case, *supra,* the question arises, Does such valid arrest give rise to a subsequent search of the stopped automobile with seizure of articles found therein? This pertains to

whether the search and seizure herein was reasonable, as only unreasonable searches and seizures come within the intent of the Fourth Amendment. *Harris* v. *United States* (1947), 331 U. S. 145, 67 S. Ct. 1098, 91 L. Ed. 1399; reh. den. 331 U. S. 867, 67 S. Ct. 1527, 91 L. Ed. 1871; affirming C. C. A. 10 Cir. (Okla.), 151 F. 2d 837, 169 A. L. R. 1413.

In recent cases, courts, both State and Federal, have condemned the practice of police officers making an arrest for a minor traffic offense as a pretense to search a person or his automobile which reveals evidence used to convict such person for a crime other than the main traffic offense. In *Barnes* v. *State* (1964), 25 Wis. 2d 116, 130 N. W. 2d 264, police stopped the defendant because his brake light was not working properly. They searched his person and found inside his pocket some marijuana. The Wisconsin Supreme Court held the search to be unreasonable, stating there could be no fruits of the misdemeanor of driving with a nonoperating brake light, and that any admissions made thereafter by the defendant with respect to marijuana were the product of an unconstitutional search and were inadmissible.

It has been held that a search of a person without a warrant is not unreasonable if it is made as an incident to a lawful arrest and contemporaneous therewith as to time and place. However, such search must be truly incidental to the primary purpose of the arrest. In *Sellars* v. *State* (1964), 237 Md. 58, 205 A. 2d 296, a state trooper was patrolling the highway. He noticed an automobile with no light over its rear registration tag. He stopped the automobile without using siren or light. The trooper testified that he jiggled the tag light and the trunk lid flew open and revealed many cartons of cigarettes. The defendant testified that the trooper turned the handle and lifted the lid. The trooper drew his revolver and placed the defendant under arrest. At the time the trooper was unaware that a service station about a mile away had been broken into and cigarettes taken. The court there stated (at page 61 of 237 Md., at page 298 of 205 A.) :

"We think the cigarettes used to convict the defendant should not have been admitted as evidence. Even if it be assumed, without deciding, that the trooper was not a trespasser and that the trunk lid opened as a result of internal pressure when it was jiggled by the trooper, it is clear there was no reasonable ground or probable cause for him to believe that a felony had been committed and that the person arrested had committed the offense. [Citing cases.] At the time the arrest was made, the trooper did not know that a nearby service station had been broken into and robbed. Since the cigarettes were not contraband, the possession of which would have been illegal, it is clear that the mere presence of what appeared to be blood on some of the cartons was not enough to warrant the arrest of the defendant or the seizure of the cigarettes under the circumstances. . . ."

In *State* v. *Cuellar* (1964), 25 Conn. Sup. 229, 232, 200 A. 2d 729, 731, the defendant was driving in the downtown area of Greenwich, Connecticut. His automobile had an out-of-state license tag. Two policemen became suspicious of the erratic operation of the vehicle and motioned the defendant to stop. He had no operator's license. One of the officers drove the defendant's car to police headquarters, followed by the defendant and the other officer in the police car. While operating the defendant's car the officer observed a large zipper bag under the driver's side of the front seat partially protruding in open view. Upon reaching police headquarters, the defendant was taken inside where he was booked for operating a motor vehicle without a license, during which time the officer removed and opened the bag and found that it contained certain new articles of clothing. During the next hour or so the Greenwich police contacted various shop owners in neighboring towns; and, about two hours after the defendant was arrested for failure to have a driver's license, a shop owner identified the property as having been stolen, whereupon the defendant was charged with larceny. The Connecticut Court stated:

"It is quite clear that upon the facts of this case the search of the car was made at least an hour before any

one of the defendants was charged with the crime of larceny and that it was solely upon the basis of the evidence uncovered by such search that the larceny charges were, in fact, made at all. Under such circumstances, *the search cannot be justified as incidental to those particular arrests*. [Citing cases.] The circumstances did not warrant immediate seizure lest the criminals flee or the articles sought to be transported out of reach before a warrant could be obtained. [Citing cases.] And the officers had ample opportunity to procure a search warrant. . . ." (Our emphasis.)

See also *Ortiz* v. *United States* (1963), 317 F. 2d 277 (5th Cir. Tex.) ; *People* v. *Mickelson* (1963), 59 Cal. 2d 448, 30 Cal. Rptr. 18, 380 P. 2d 658.

In the case at bar, the search conducted by the Tennessee troopers had nothing to do with, and was not incidental to, the arrest made requiring appellant to display his driver's license. They did not know of any crime committed which involved him. If, after stopping him, they had looked into his car and seen something which would have been of an illegal nature, such as a revolver on the floor, this would have been grounds for arrest *then* in that he was committing a misdemeanor in the presence of the officers. This would have been without any invasion of the vehicle and thus *not* a violation of constitutional rights. *Morgan* v. *Town of Heidelberg* (1963), 246 Miss. 481, 150 So. 2d 512.

There was no contraband or illegal matter on view in appellant's car. Money sticking out of a shaving kit is not wrong in itself. In fact, one of the officers testified that, as far as they knew, they thought the money was his—they "didn't know." Many people carry large sums of money in different ways. Some carry it around their waists in money belts; some put it in their socks; some stuff it in pillows or mattresses. Just because it may be noticeable on their persons or possessions does not indicate a crime has been committed and authorize a search and seizure. The officers herein had no reasonable grounds to believe that the partic-

ular shaving kit with currency sticking out of it was stolen or was involved in an unlawful enterprise.

The Tennessee State Police were definitely put on notice that something was wrong when they counted the money from the shaving kit and discovered the National Bank wrappers. This, however, was a "prying into hidden places for that which is concealed." *McCoy* v. *State* (1960), 241 Ind. 104, 115, 170 N. E. 2d 43, 48. This was not a discovery which was open to view. *Lindsey* v. *State* (1965), 246 Ind. 431, 204 N. E. 2d 357.

All the evidence which was introduced over objection at the trial of appellant, including his admissions, was obtained after he had been stopped for a routine check of his driver's license. We can find that the officers had no reasonable cause to believe that a crime had been committed when they stopped him. The search they made of him personally and of his automobile was not truly incidental to the primary purpose of the arrest. It is the general rule that an arrest is not justified by what the subsequent search discloses. *Henry* v. *United States* (1959), 361 U. S. 98, 80 S. Ct. 168, 4 L. Ed. 134, *supra; Brown* v. *State* (1951), 229 Ind. 470, 99 N. E. 2d 103, *supra.*

It must be remembered that appellant was never charged or booked for failure to have a driver's license under the Tennessee law. Furthermore, he was placed in the Memphis jail after having been interrogated at State Police District Headquarters the afternoon he was arrested. There was plenty of time for the law enforcement officers to have obtained a warrant for the search of his automobile, which might have placed them in a better position to book him for armed robbery.

It has been held that the prohibition of the Fourth Amendment against unreasonable searches and seizures is enforceable against the State through the due process clause of the Fourteenth Amendment, and hence a state has no power to

sanction searches and seizures prohibited by the Fourth Amendment. *Mapp* v. *Ohio* (1961), 367 U. S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 84 A. L. R. 2d 933. Reh. Den. 368 U. S. 871, 82 S. Ct. 23, 7 L. Ed. 2d 72.

We find that the search and seizure of appellant and his motor vehicle was unreasonable and in violation of his constitutional rights under the Fourth Amendment to the United States Constitution, and that the introducion into evidence of the articles seized and appellant's admissions constituted reversible error. In so doing, we do not condone or overlook the fact that a crime may have been committed which harmed individuals and society as a whole. However, we feel that the issue presented herein is broad enough to affect the fundamental rights of every citizen of this country. To quote from the opinion in *Henry* v. *United States, supra* (at page 104 of 361 U. S., page 172 of 80 S. Ct., pages 139, 140 of 4 L. Ed. 2d) :

> "Under our system suspicion is not enough for an officer to lay hands on a citizen. It is better, so the Fourth Amendment teaches, that the guilty sometimes go free than that citizens be subject to easy arrest."

The judgment of the Vanderburgh Circuit Court should be reversed, and this case should be remanded with instructions to sustain the motion to suppress the evidence.

Jackson, J., concurs.

## SEPARATE OPINION

RAKESTRAW, J.—The appellant was convicted of robbery in the court below and sentenced to a term of ten to twenty-five years at the Indiana Reformatory. He was tried before the court without a jury. In his appeal, he does not question the sufficiency of the evidence presented to sustain a finding of guilt, nor does he question seriously any of the procedures in the court below save for the questions related to his arrest and the evidence obtained following his arrest.

The appellant was apprehended in a very unusual manner. Taking the evidence most favorable to the appellee, it appears that the appellant was driving a 1957 Chevrolet on U. S. Highway No. 70 approaching Memphis, Tennessee, on February 28, 1964. The car bore Illinois license plates. Two Tennessee state troopers were patrolling the highway in this vicinity. They were stopping automobiles at random and inspecting drivers' licenses of the operators, pursuant to a Tennessee statute which authorized such investigation. The appellant does not question the validity of the Tennessee statute permitting automobiles to be stopped for the purpose of checking operators' licenses. The troopers stopped the appellant outside of Memphis. He got out of his automobile, and the troopers asked for his driver's license. He searched through his pockets and was unable to find his license. The troopers then informed him that they would have to take him to town on a charge of not having an operator's license.

The appellant asked for permission to search for his license in his automobile. He then went back, got into his automobile, and rifled through the glove compartment for the operator's license. The troopers followed him to his automobile, one of them going on each side of the automobile as he searched. As he opened the glove compartment and rifled through its contents, the officers noted among other things two ten dollar bills. The trooper opposite the driver's side of the automobile then noticed a shaving kit sticking out from under the front seat of the automobile. The shaving kit was open, and a large wad of bills encircled with a rubber band was visible from the outside of the automobile.

The troopers then arrested the appellant, and asked him to open the automobile door opposite the driver's side from the inside. The appellant did open the door. The troopers inquired as to where he obtained the money, and he stated that he had won it gambling with a white lady in Las Vegas, California.

The troopers took the appellant, and his automobile to the State Police Headquarters, and examined the contents of the shaving kit. In the process, they found some currency wrappers with the name of the Old National Bank of Evansville, Indiana on them.

The F.B.I. was then called in, and the appellant was informed of his right to counsel and was questioned concerning the money. He first stated that he had obtained the money by holding up a person who was making a deposit at a night depository. When the Evansville police were contacted they informed the Tennessee authorities that the appellant was wanted for the robbery of the Penny Can Market. They were seeking the appellant on information given them by an informer.

After further questioning, the appellant admitted the robbery of the Penny Can Market, the crime with which he was here charged.

In his brief, the appellant refers to numerous provisions of the United States Constitution and the Indiana Constitution, and the arguments made by the appellant are long and involved. We believe, however, that the issues properly raised by the appellant in his brief and properly applicable to the facts as shown by the record can be stated very simply as follows:

1. Was the appellant denied his Constitutional right to counsel subsequent to his arrest?

2. Was the appellant's arrest, and the search following such arrest invalid so as to make the evidence obtained inadmissible at his trial? We will take up these issues in that order.

As to the appellant's right to counsel, the evidence favorable to the appellee indicates that the appellant was informed of his right to counsel early in the interrogation, and well before his final confession to the crime with which

he was charged. The evidence does not indicate that the appellant was denied counsel at any time, or that he requested it at any time. He was furnished counsel upon his return to Evansville. The appellant relied upon *Escobedo* v. *Illinois* (1964), 378 U. S. 478, 84 S. Ct. 1758. We believe that the Escobedo case is not applicable to the situation of the appellant. Certainly all of his confessions were voluntary. There is no evidence to indicate any force or duress in obtaining the confessions.

There is considerable confusion in the briefs as to what constituted the arrest of the appellant and whether or not any searches were properly incident to any arrest. The appellant was stopped and asked for his driver's license. However, an examination of the evidence indicates very clearly that the appellant was finally arrested, taken into custody, and taken to the State Police post after the state troopers saw the money in the shaving kit on the floor of his car. He was never arrested for failing to have a driver's license. After he was arrested, the shaving kit, one of his personal effects, was searched. It was from this search of the shaving kit that the first incriminating evidence was discovered.

If the arrest itself was proper, it is clear that this search of the shaving kit was a search reasonably incidental to the arrest which followed the discovery of the money. It is of course well settled that a search may be made if it is reasonably incidental to a valid arrest. *McCoy et al.* v. *State* (1958), 237 Ind. 654, 148 N. E. 2d 190; *Stearsman, Peak, Carter* v. *State* (1957), 237 Ind. 149, 143 N. E. 2d 81; 25 I.L.E., Searches and Seizures § 22; Ewbank's Indiana Criminal Law § 75 (Symmes Ed.)

The question that must be answered is whether at the time they made the arrest, the Tennessee State Troopers had probable cause to make the arrest. In other words, from the information they had, would a prudent man have believed that the appellant had probably committed a crime? *Beck*

v. *Ohio* (1964), 379 U. S. 89, 85 S. Ct. 223, 13 L. Ed. 2d 142; *Henry* v. *United States* (1959), 361 U. S. 98, 80 S. Ct. 168, 4 L. Ed. 2d 134; *Brinegar* v. *United States* (1949), 338 U. S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879.

From their testimony, it is clear that the state troopers made the arrest because they believed that the possession of such a large sum of money, carried in such casual fashion under the circumstances indicated that a crime had been committed by the appellant. Their belief was reinforced by the general appearance and behavior of the appellant and by the appearance and condition of the automobile which he was driving. Their belief was rapidly fortified by the appellant's story that he won the money by gambling with a white woman in a nonexistent location. The conclusion drawn by the officers was a conclusion logically drawn from the circumstances. Had the officers failed to act, they would have been derelict in their duty to enforce the law.

The appellant argues that it is not against the law to have large sums of money and to carry them in this fashion. It is possible that a person could carry money such as this without having committed a crime. However, if a person chooses to behave in so unconventional a manner, he has no absolute right to be free from reasonable inquiry. Such conduct in this case was not innocent.

The judgment of the trial court should be affirmed.

Arterburn, C. J., concurs.

NOTE.—Reported in 222 N. E. 2d 397.