PAXTON AND ATHERTON *v*. STATE OF INDIANA.

[No. 668S106. Filed November 20, 1970. No petition for rehearing filed.]

*William L. McClellan,* of Greencastle, for appellants.

*Theodore L. Sendak,* Attorney General, *Curtis C. Plopper,* Deputy Attorney General, for appellee.

HUNTER, C.J.—Appellants were charged by affidavit with the crimes of theft and second degree burglary. Trial before a jury resulted in a verdict of guilty and sentence was pronounced thereon. On this appeal, appellants question the validity of a search conducted by police officers incident to a purported arrest on a charge of reckless driving. The essential question on this appeal relates to the propriety of the

trial court's overruling appellants' motion to suppress the evidence discovered as a result of that search.

Briefly the facts and circumstances surrounding the arrest of appellants are as follows: Police Officer John Bishop observed appellant Paxton driving a car eastward in the 1400 block of DeLoss Street in Indianapolis at approximately 4:00 A.M. on the morning of January 16, 1968. When the car pulled up on the north side of the street, Officer Bishop stopped and informed Paxton that he was under arrest for reckless driving. As near as can be determined from the record before us, the "reckless driving" consisted of appellant Paxton's act of parking the car on the north side of DeLoss Street in the face of oncoming traffic. At any rate, appellant Paxton and his two companions, Atherton, also an appellant on this appeal, and Silcox were searched and placed in Officer Bishop's squad car while Bishop then made a preliminary search of Paxton's car. Underneath the front seat he found an overcoat belonging to Paxton which contained approximately thirty-eight dollars ($38.00) in change.[1]

According to Officer Bishop's testimony, he then placed the above named individuals under arrest on a "pre-burglary" charge. This arrest was apparently made on the basis of

1. Although Officer Bishop never stated precisely where the coat was found, the following testimony is the basis for our conclusion that it was found underneath the front seat. At trial, on direct examination, Officer Bishop testified as follows:

"Q. What did you do then?
A. I placed them in my squad car, and walked up to the Oldsmobile, and looked in the front seat, *underneath* the front seat.
Q. What did you see there?
A. I found a coat which John Paxton later told me was his, and I found approximately $38.30 in nickels and dimes in the right hand pocket." (our emphasis)

It is clear that those present understood Bishop to mean underneath the seat because on cross examination defense counsel asked the following question:

"Q. All right. And did you search—did you go into the car and search *under the front seat*, and find his coat before or after you arrested him?
A. That was afterwards." (our emphasis)

Officer Bishop's knowledge that a tavern located in the vicinity had been broken into about one-half hour earlier and change had been removed from a cigarette machine located there.

Soon after appellants had been placed in the squad car and the overcoat discovered, Officer Hutchison arrived on the scene to assist Officer Bishop. Officer Hutchison then conducted a further search of the automobile and by peering into the trunk through an aperture located behind the back seat discovered several items which further aroused their suspicions. The items thus extracted from the trunk through the hole turned out to be rifles with sales tags still affixed. A wrecker was called and the car taken to Police Headquarters where the trunk lid was subsequently pried open. Numerous articles were recovered which were shown to have been stolen in robberies occurring in Cloverdale, Indiana.

In our view the resolution of the issue relating to the validity of the search in this case must be made using the discovery of the overcoat as the primary focal point. Had the overcoat been found pursuant to a lawful search, one might argue with some degree of plausibility that Officers Bishop and Hutchison would then have had probable cause to further search the automobile,[2] and if probable cause in fact existed, such a search would have been within the ambit of reasonableness required by the Fourth Amendment to the United States Constiution notwithstanding their failure to obtain a search warrant. *Chambers* v. *Maroney* (1970), 399 U. S. 42, 26 L. Ed. 2d 419. *Patterson* v. *State* (1970), 253 Ind. 499, 255 N. E. 2d 520.

Turning then to the circumstances surrounding the discovery of the coat, we are constrained to point out Officer Bishop's testimony relative to the facts that prompted his

2. Although we do not purport to determine whether probable cause existed there are several factors which would substantiate such an argument. (1) Officer Bishop had information that a tavern had been robbed and change removed from a cigarette machine; (2) approximately thirty-eight dollars in small change was recovered from Paxton's coat; (3) Paxton and his companions were apprehended in close proximity to the burglarized tavern; (4) within minutes after the reported robbery.

initial contact with appellants. On cross-examination at the hearing on the motion to suppress Officer Bishop testified as follows:

"Q. You haven't told the Court what first brought your attention to this particular automobile, can you tell how your attention was first called to the automobile?

A. Yes sir, they were going east on DeLoss, I turned around, they pulled up on the north side of the street, headed east, in the 1400, in fact in the front of 1446 DeLoss Street.

Q. And was any other traffic on the road?

A. No sir, there wasn't.

Q. And was it the fact that this car was proceeding along DeLoss Street at 4:00 o'clock in the morning what attracted your attention first to the car?

A. It had a little bit to do with it, yes sir.

Q. And was that unusual?

A. No sir, I was looking for a burglar suspect that just broke into a tavern in the 2500 block on Shelby Street.

Q. You hadn't been forwarded the description of John Paxton, or William Silcox, or the other one?

A. No sir. The only description was a short stocky male.

Q. So, you didn't connect this car with that particular burglary?

A. No sir.

Q. You didn't notice anything else about the car which attracted your attention to it other than the lateness of the hour?

A. No sir.".

It must be assumed then, that Officer Bishop's only legitimate reason for stopping the automobile was for the purpose of arresting appellant Paxton on a charge of reckless driving.

Appellant challenges the validity of the arrest and resulting search on the grounds that the elements of reckless driving were wholly absent. Ind. Ann. Stat. § 47-2001 (1965 Repl.)

defines reckless driving as the act of driving a vehicle with reckless disregard for the safety, property or rights of others. As was indicated previously appellant Paxton's "reckless" act was apparently that of parking on the north side of DeLoss Street in the face of oncoming traffic. Whether such an act would constitute "reckless driving" has not been decided. However, it is extremely difficult to imagine how it could be held to be such especially under the facts in this particular case since the evidence disclosed that there was no other traffic on the street at the time. In fact it might reasonably be inferred that the "arrest" was a mere pretext used by Officer Bishop to conduct a search of appellants. Such police conduct in our opinion should be closely scrutinized by the courts of this state if Fourth Amendment sanctions are to continue to have any protective vitality.

Notwithstanding the above, we are willing to assume *for the purposes of this case,* that Officer Bishop saw Paxton driving in such a manner as to cause him to reasonably believe that Paxton was driving recklessly.

Appellant also attacks the search on the ground that it was not incident to a "valid" arrest in that Officer Bishop failed to follow the statutory requirements in making an arrest for a traffic violation. Ind. Ann. Stat. §§ 47-2307-2308 (1965 Repl.) provide that a person arrested on a traffic violation punishable as a misdemeanor shall be taken *immediately* before a magistrate within the county in which the offense charged is alleged to have been committed or be released (if a resident of this state) upon giving written promise to appear in court. Officer Bishop failed to make out a traffic ticket at the scene and likewise failed to take appellant Paxton before a magistrate within a reasonable time after the arrest. In fact, he was not slated to appear in court until some twenty-nine (29) hours after the arrest.

The above, however, is not dispositive on the question of the validity of the search. Assuming that Officer Bishop saw

Pàxton driving in a manner reasonably thought by ■ Bishop to be a violation of the reckless driving statute, he had sufficient reason to make the arrest. The mere fact that he subsequently failed to effect same in no way impinges upon his right at the time of the arrest to make a *valid* search incident thereto. If Officer Bishop had probable cause to arrest Paxton on a reckless driving charge, that alone in our view would be determinative of his right to conduct the search.

Assuming the validity of the arrest, the primary question to be answered is the nature and scope of a search that can be made incident to an arrest on a traffic violation. The answer to this question lies in a careful analysis of recent Supreme Court cases dealing with the Fourth Amendment protections against unreasonable searches and seizures. Although we concede that any conclusion is difficult under the general terms often characterizing such cases, we feel the following result is not only constitutionally correct, but require by recent United States Supreme Court cases.

As a premise from which to begin, it would seem clear that the mere fact of an arrest, by itself, would not necessarily justify a warrantless search incidental thereto:

> "A search or seizure without a warrant as an incident to a lawful arrest has always been considered to be a strictly limited right. *It grows out of the inherent necessities of the situation at the time of the arrest.* But there must be something more in the way of necessity than merely a lawful arrest." (our emphasis) *Trupiano* v. *United States* (1948), 334 U. S. 699, 708, 92 L. Ed. 1663, 1671.

Several recent United States Supreme Court cases culminating in *Chimel* v. *California* (1969), 395 U. S. 752, 23 L. Ed. 2d 685, have dealt with the permissible scope of a warrantless search incident to an arrest and the principles there enuciated are of interest here. *Chimel* involved the search of a residence without a warrant following the arrest of a suspect on a charge of burglarizing a coin shop. The Courts

holding expressly utilized the reasoning of *Trupiano* by recognizing that the exigencies of the circumstances often required immediate action on the part of the arresting officer to prevent harm to himself or the destruction of evidence.

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. *There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."* (our emphasis) *Chimel* v. *California, supra,* 395 U. S. at 763, 23 L. Ed. 2d at 694.

Thus it was made clear that the *necessities of the situation at the time of the arrest* justify the warrantless intrusion, not the fact of the arrest.

Identical reasoning had previously been employed in the case of *Terry* v. *Ohio* (1968), 392 U. S. 1, 20 L. Ed. 2d 889, where the court held that a limited "search" of a suspect's outer clothing (frisk) was justified where the police officer, having stopped the suspect for questioning upon a reasonable suspicion that criminal activity was afoot, had reason to believe that he was in danger. It was there stated that "[T]he scope of [a] search *must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible."*

Note should be made nevertheless that these cases establish the outer bounds of reasonableness for the particular factual settings under which they were decided. Thus, it would clearly

be unreasonable to sanction a search incident to an arrest, absent other factors, where the arresting officer had no reason to suspect that he was in danger *or* where there was not probable cause to believe that there was destructible evidence relating to the crime within the suspect's immediate control.

This point is forcefully made in *Sibron* v. *New York* (1968), 392 U. S. 40, 20 L. Ed. 2d 917, where a policeman conducted a search of Sibron's person after Sibron's emerged from a restaurant where he had talked to several known drug addicts. In holding the heroin thus found to be inadmissable, the court noted that the searching officer *did not* have probable cause to believe that Sibron was carrying seizable evidence. The Court recognized that the search might still have been justified if the officer had had reasonable grounds to believe that Sibron was armed and dangerous. However, the Court found nothing in the record to indicate that the officer had conducted the search upon a reasonable suspicion that he was in danger; in fact the court expressly found that even had there been such grounds, the nature and scope of the search were so clearly unrelated to that justification as to render the heroin inadmissible:

> "The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Sibron* v. *New York, supra,* 392 U. S. at 65, 20 L. Ed. 2d at 936.

Clearly, the reasonableness of a warrantless search incident to an arrest in terms of both its initiation and scope must be determined from the inherent necessities of the circumstances surrounding the arrest.

Although *Chimel* and those cases preceding it set out guidelines for the permissible scope of a search incident to an arrest, that scope is somewhat extended where the defendant is arrested while in an automobile. An extension of the permissible scope as defined in *Chimel* may easily be rationalized in such a case on the basis that an additional element of neces-

sary is interjected, namely the mobility of the automobile; given the automobile's mobility and the fact that its occupants are alerted, any seizable goods contained therein may never again be found. *Carroll* v. *United States* (1925), 267 U. S. 132, 69 L. Ed. 543. Although *Carroll* is not a "search incident to an arrest" case, it is pertinent to our analysis insofar as it recognizes an exception to the search warrant requirements of the Fourth Amendment, and where a search is sought to be made incident to an arrest in a situation with the added exigent circumstances of an automobile's mobility, the rationale of *Chimel* must be supplemented with that of *Carroll*.

The Supreme Court, however, has been quick to point out that the right to search the entire car is not an unqualified one:

> "In *Carroll* v. *United States*, 267 U. S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 39 ALR 790 (1925), the issue was the admissability in evidence of contraband liquor seized in a warrantless search of a car on the highway. After surveying the law from the time of the adoption of the Fourth Amendment onward, the Court held that automobiles and other conveyances may be searched without a warrant in circumstances which would not justify the search without a warrant of a house or an office, *provided that there is probable cause to believe that the car contains articles that the officers are entitled to seize.*" (our emphasis) *Chambers* v. *Maroney, supra,* 399 U. S. at 42, 26 L. Ed. 2d at 426.

Thus, due to the exigent circumstances existing where one is arrested while in an automobile, it may be searched entirely without regard to the officer's safety or the possible destruction of evidence, *provided* there is probable cause to believe that seizable items are there contained.

From the foregoing it is apparent that there are two not mutually exclusive theories upon which the search of an automobile may be constitutionally rationalized on an arrest for a traffic violation. Under the *Chimel* doctrine a cursory search of the area under the driver's control might be made if the arresting officer reasonably suspects that he is in danger or that there is evidence of the offense which might be de-

stroyed. Although in most cases it would appear doubtful that either situation would exist, the possibility is nevertheless recognized.

Likewise the *Carroll* doctrine might be relevant where the arresting officer, notwithstanding any thought of his immediate danger or the destruction of evidence had reason to believe that evidence pertaining to the traffic violation was contained somewhere in the car. An example of such a situation would be where the driver is arrested on a charge of driving while intoxicated and the arresting officer had reason to believe that liquor may be in the automobile. See e.g. *State* v. *Halko* (Del. 1960), 188 A. 2d 100; *Hodge* v. *State* (Okla. 1953), 258 P. 2d 215.

Under neither doctrine can the search leading to the discovery of the overcoat here be justified. Appellant was purportedly arrested for reckless driving. The officer's observance of the offense provided a probable cause basis for an arrest of the driver, an event which might then, under the particular facts of the case, justify an incidental search. *The reasonableness of a search, incident to that arrest, both in terms of its initiation and scope, however, depended entirely upon the facts and exigent circumstances, then existing.* Given this principle, it is our considered opinion that the resulting search in this case was unreasonable under the circumstances of the arrest as previously outlined. It cannot be justified under the principles of *Chimel* as within the permissible scope incident to an arrest since the evidence taken from the automobile to which the motion to suppress was directed *was not discovered until the persons of appellant Paxton and his two companions had been searched and placed in Officer Bishop's squad car.*[3] The arresting officer no longer had any reason to believe he was in danger nor could appellants have destroyed any evidence contained in the car from

---

3. Needless to say a question might be raised as to the propriety of the search of the occupants of the car. However we need not reach that question here since the motion to suppress was only directed to evidence found subsequent thereto.

their position in the rear seat of the squad car. The exigencies for which the *Chimel* exception to search warrant requirements had been recognized were here entirely mitigated. Consequently, under *Chimel* the subsequent return to the car for purposes of conducting the search cannot be constitutionally rationalized. Likewise the *Carroll* Doctrine would be an inadequate basis upon which to justify the extended search, since we fail to conceive of any seizable items which could have been contained in the car relative to an arrest on a charge of reckless driving, nor is there any evidence in the record from which we might conclude that the officers, prior to the discovery of the overcoat, had probable cause to believe the car contained seizable items.

An argument that the search was a reasonable and necessary measure for the protection of the police officers involved as well as the property of appellants would not be persuasive. Once appellants were safely in Officer Bishop's squad car, Bishop no longer had reason to suspect he was in danger. Further it was unnecessary to search the car for the "protection" of property contained therein since appellant Paxton was presumably the only one arrested on the reckless driving charge, he having been the driver; either of his two companions could have stayed with the automobile or driven it to Paxton's place of residence.

Appellee, in attempting to establish that the police officers had probable cause to conduct the search point out that appellant Atherton and Silcox were "suspicious persons" known to both Bishop and Hutchison. We find this argument to be blatantly offensive. It will be a sad day indeed when this court sanctions the detention and search of persons and their property on the mere allegation that they are of suspicious character. We do not consider the case of *Williams* v. *State* (1966), 248 Ind. 66, 222 N. E. 2d 397, cited and relied on by appellee to be binding since it was decided prior to the holdings of the recent United States Supreme Court cases upon which we have relied and because

the trial court in that case was affirmed by reason of *an equally divided court.*

In conclusion it should be pointed out that Atherton has standing to seek suppression of the evidence found in the automobile even though he was a mere passenger:

"No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone *legitimately on the premises where a search occurs* may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." *Jones* v. *United States* (1960), 362 U. S. 257, 267, 4 L. Ed. 2d 697, 706.

We are not here concerned with the protection of property rights, but rather with the protection of the right to privacy. *Katz* v. *United States* (1967), 389 U. S. 347, 19 L. Ed. 2d 576. There can be no question but that Atherton had standing to challenge the search, he having been a passenger in the car at the time the evidence was recovered.

For all the foregoing reasons we are of the opinion that appellants' motion to suppress the evidence should have been sustained. The judgment of the trial court is therefore reversed and a new trial ordered.

Judgment reversed.

DeBruler and Jackson, JJ., concur; Arterburn and Givan, JJ., dissent with opinion.

### DISSENTING OPINION

GIVAN, J.—I dissent from the majority opinion in this case. The majority recognizes the general rule in *Chimel* v. *Calif.* (1969), 395 U. S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034, which holds that at the time of an arrest the arresting officer may lawfully conduct a search of the person of the one arrested and of the immediate surroundings in order to secure the safety of the arresting officer. The majority opinion also points out that in conjunction with the arrest the officer searched under the front seat of the appellants' car where he

found an overcoat containing approximately $38.00 in change. The Supreme Court of the United States at page 763 in the Chimel case stated:

> "* * * And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."

I think the above language is very applicable to the case at bar. Conceding as the majority opinion does that the arrest was a lawful arrest, I interpret the language from *Chimel* and cases of like import to mean that the arresting officer may search the person being arrested and the area immediately within his reach *at the time the arrest is effected.* In this case at the time Paxton was arrested he was seated behind the steering wheel in the driver's seat of the automobile. From the officer's testimony the overcoat in which the change was found was within easy reach of Paxton as he sat behind the wheel. To say that when the officer required Paxton to step out of the car he could not then search the area in the car within Paxton's reach at the time of the arrest is to make a strained and distorted application of the rule. What we are concerned with at the time an officer is making an arrest is that officer's safety before he can secure the area. To say that the officer in order to search those places which Paxton could have easily reached while he was seated behind the wheel would have to conduct his search before he required Paxton to alight from the automobile would certainly be placing the officer in a most hazardous position. Yet to say that once he removed Paxton from the automobile he immediately lost his power to search those areas would place him in a position where he could not afford to allow the

arrested person to return to the seat of his automobile and proceed, for if no search could be conducted the arrested person could return to the seat, obtain an unfound weapon and at that time injure the officer. Following the majority's reasoning in this case, it would be just as logical to say that a police officer would have to search the pockets of a suspect before he made him lean against a wall with outstretched hands or before he placed handcuffs upon his wrists, arguing that once the suspect was helpless leaning against a wall in an outstretched position or was wearing handcuffs he could no longer reach his pockets, therefore the officer was no longer in danger and therefore could not search the pockets.

I am unwilling to place arresting officers in the hazardous position which I believe the application of the majority opinion in the case would require.

I think the search in this case was lawfully conducted following a lawful arrest in order to secure the area within the immediate reach of the Appellant Paxton at the time the arrest was effected as authorized under *Chimel* v. *Calif., supra.*

At the time the overcoat was recovered and the $38.00 worth of change found in the pockets the arresting officer, because of prior information of the existence of a burglary in the neighborhood in which a vending machine had been opened, had probable cause to then conduct a search of the entire automobile for the possible discovery of the fruits of the burlgary for which he then had probable cause to believe the appellants had committed.

I would, therefore, affirm the conviction in this case.

### DISSENTING OPINION

ARTERBURN, J.—I must dissent from the majority opinion because I think it leads to an absurd result.

The appellants were charged by affidavits for the crime of theft and second degree burglary. The charges were filed in separate affidavits and subsequently consolidated and tried

together before a jury. The verdict of the jury was guilty of each charge against each appellant.

The essential question on this appeal revolves around the arrest of the appellants and the contention that the subsequent search based on the arrest was illegal and that, therefore, the evidence obtained thereby was not admissible to sustain the convictions.

Officer John Bishop was cruising along DeLoss Street in the City of Indianapolis about 3:30 a.m. on January 16, 1968, when he received a radio message that a tavern in the 2500 block of Shelby Street had been broken into. Money and cigarettes were taken from a cigarette machine and liquor was taken from the tavern. Officer Bishop had the description of a short, stocky male being involved. About 4:00 a.m. the officer in the car saw the car driven and owned by appellant Paxton drive up and stop on the wrong side of the street, headed against traffic. At the time he found appellant Atherton in the car with the appellant Paxton and also a third person by the name of Silcox. The officer recognized both Atherton and Silcox. Officer Bishop saw, from the outside of Paxton's automobile, a topcoat belonging to Paxton. He reached into the car, pulled out the coat and found that it had $38.30 in nickels and dimes in it. He took the coat to the patrol car and asked Paxton where he had gotten the money. Paxton said he had been playing a poker machine.

Officer Hutcheson, who arrived on the scene to assist Officer Bishop, stated that he was familiar with Mr. Silcox, having "run into him several times". He further testified regarding the arrest:

"A. At that time, after we placed them under arrest, I got out of my car, normal procedure is to tow in the vehicle, and secure the property. I begin to check the car inside and outside. And on the outside of the car hanging out of the trunk was a wire. I, at that time did not know what was under—what was connected to this wire that was sticking out of the back of the trunk. So I went back to the car, the police car where the three subjects were sitting and ask them if

anyone had the key to the trunk. Mr. Paxton stated that he did not have a key for the trunk. So I went back to the Oldsmobile, got into the car, as I checked in the back seat, I looked down over the back seat and I could see a beer case, an open beer case with cigarettes in it. At that time, I reached down and pulled the rest of the flap, I could see part of a case, where there was a flap underneath the flap, so I pushed the flap back, and as I looked back into the trunk of the car, I saw some weapons, rifles, at that time I thought they were all rifles. So I pulled the rifles out. These rifles still had on them serial-er-tags, that was still on the weapon as if they—when you buy them you take them off. They still had the tags on them. And they had—I could see a number of cartons of cigarettes inside the cases, the beer cases inside the trunk of the car. At that time we called for a superior officer, in the meantime and a wrecker and I was in the car, all three subjects were very talkative, * * *"

Officer Bishop testified with reference to the overcoat containing a large amount of small change that was found in the car, as follows:

"Q. Which side of the front seat—where was this coat?
"A. It—I believe, it must have been where Paxton—in between Paxton and Atherton, that's where it was when I picked it up. I don't know if one of them had been sitting on it or not.
"Q. More toward the driver's side than the other side?
"A. Yes sir."

It will be remembered the officers were informed a cigarette machine had been broken into and money taken. We asked incidentally at this point, what was the duty of the officers with reference to this overcoat—give it back to the prisoners or examine it for deadly weapons or other contents?

Motions by both appellants were made to suppress the evidence obtained by the search. We note first that appellant Atherton has no standing to ask the suppression of the evidence obtained by the search of the automobile which he

did not own or possess at the time, or control. 25 I. L. E., *Search and Seizure*, Sec. 5, p. 417.

In this case the arrest for traffic violation, namely, reckless driving on the wrong side of the street, was proper and legal. It was committed in view of Officer Bishop. The question then arises: At 4:00 a.m. in the morning, what was the duty of the officers with reference to the arrested parties and the car which the appellant possessed?

An officer making an arrest has a right to do those things reasonably necessary to protect himself, the prisoner, or *any property in control of the prisoner at the time of the arrest*. In this case it goes without saying the officers *should not have abandoned the opened and unlocked automobile that was on the wrong side of the street at the time of the arrest*. They had a duty to use prudence and good judgment in the protection of such property, as well as search it for any instruments or weapons that might be used in an attempt to escape or assault the officers. No argument is needed to sustain the proposition that proper conduct on the part of officers requires that they should not leave an automobile abandoned on a street if there is any reasonable alternative. From the very nature of the situation, the officers had to make some type of inspection of the vehicle. What they saw brought about a further investigation and search. In our judgment the official police officer had no alternative in this case except to retain these individuals in his custody at that time of night until a further investigation could be made.

We ask: What are the reasonable duties of an arresting officer with reference to vehicles in the custody of the persons arrested? Apparently the majority opinion would say: "Don't look inside them, you might see something needing protection, such as coats, traveling cases, etc., or something needing further investigation. Don't suspect them—just leave the car and its contents as they are found, on the wrong side of the street and a hazard to traffic at that time of night." That

is the gist of the issues in this case. The more recent interpretations given to the law of search and seizure are, in my opinion, making the courts appear ridiculous.

One of the officers found a wire protruding from the rear trunk of the car. When appellant Paxton had no key to open the trunk, the officer made an investigation from inside the car into the rear of the trunk, where he found cigarettes and guns.

> "The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape. . . ." *Preston* v. *United States* (1964), 376 U. S. 364, 367, 84 S. Ct. 881, 883, 11 L. Ed. 2d 777, 780.

This view was later espoused in *Chimel* v. *California* (1969), 395 U. S. 752, 762, 89 S. Ct. 2034, 2040, 23 L. Ed. 2d 685, 694:

> "A similar analysis underlies the 'search incident to arrest' principle, and marks its proper extent. When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."

This Court has previously held an automobile may be searched upon arrest of the driver for a traffic violation. In *Neely* v. *State* (1959), 240 Ind. 362, 164 N. E. 2d 110, the

accused had run a stop sign. In searching the car, the police officers found narcotics to be present. We held such a search to be reasonably incident to a lawful arrest and could properly be made though accomplished without a search warrant.

It was stated in the case of *Williams* v. *State* (1966), 248 Ind. 66, 81, 222 N. E. 2d 397, 405, as follows:

"From their testimony, it is clear that the State Troopers made the arrest because they believed that the possession of such a large sum of money, carried in such casual fashion under the circumstances indicated that a crime had been committed by the appellant. Their belief was reinforced by the general appearance and behavior of the appellant and by the appearance and condition of the automobile which he was driving. Their belief was rapidly fortified by the appellant's story that he won the money by gambling with a white woman in a nonexistent location. The conclusion drawn by the officers was a conclusion logically drawn from the circumstances. Had the officers failed to act, they would have been derelict in their duty to enforce the law."

There was sufficient evidence to sustain the finding of a valid arrest for reckless driving. The trial court did not err in overruling the appellants' motions for a new trial. The search was reasonably incident to the valid arrest and was justifiable on the basis of protecting the arresting officers.

In my opinion the judgment should be affirmed.

NOTE.—Reported in 263 N. E. 2d 636.