TERRY SAYNE *v.* STATE OF INDIANA.

[No. 171S2. Filed March 2, 1972. Rehearing denied May 1, 1972.]

John L. Kellerman, *Wycoff & Greeman,* of Batesville, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert A. Smith,* Deputy Attorney General, for appellee.

DeBruler, J.—The appellant was tried before the Honorable William J. Schroder, Judge, and a jury on the 23rd and 24th days of June, 1970, in the Circuit Court of Ripley County. He was found guilty of the offense of possession of narcotic drugs, in this case .32 ounces of marijuana, and sentenced to not less than two nor more than ten years in the Indiana Reformatory. The appellant asserts as error the overruling of his motion to suppress the marijuana seized from his automobile. It is uncontested that appellant's car was stopped by the police solely for the reason that the right headlight was not functioning on the car, and appellant contends the search of the automobile following this stop for a traffic offense violated his constitutional rights.

It is unquestioned that automobiles are within the zone of privacy guarded by the Fourth and Fourteenth Amendments to the United States Constitution as well as by Art. 1, § 11 of the Indiana Constitution. *Carroll* v. *U.S.* (1925), 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543; *Paxton* v. *State* (1970), 255 Ind. 264, 263 N. E. 2d 636. When deciding questions in this area, we do not simply apply our own common sense and individual intuitions to the problem and decide on that basis alone. On the contrary, we decide these cases within a constitutional context; a context which surrounds every constitutional decision and sets the background in which the specific decision is made.

In a case such as the one before us, in which the intrusion might seem slight, it is well to recall the constitutional wisdom which forms the context of our decision. Such a task was recently performed expertly by Justice Stewart speaking in *Coolidge* v. *New Hampshire* (1971), 91 S. Ct. 2022. In that case, also involving the search of an automobile under somewhat different circumstances, Justice Stewart said:

> "we must not lose sight of the Fourth Amendment's fundamental guarantee. Mr. Justice Bradley's admonition in his opinion for the Court almost a century ago in Boyd v. United States, 116 U.S. 616, 635, 6 S. Ct. 524, 525, 29 L. Ed. 746, is worth repeating here:
>
>> 'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.'
>
> "That the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* un-

reasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption * * * that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagent' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won—by legal and constitutional means in England, and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing every man's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important."

It is that context on which we decided *Paxton* v. *State, supra,* which was concerned as we are in this case with the propriety of a search following a stop for a traffic violation. In that case, we said, "a cursory search of the area under the driver's control might be made if the arresting officer reasonably suspects that he is in danger or that there is evidence of the offense which might be destroyed," and that,

"the reasonableness of a search, incident to that arrest, both in terms of its initiation and scope, however, depended entirely upon the facts and exigent circumstances, then existing." 263 N. E. 2d at 641.

The State argues that the search was justified on the ground that the two officers reasonably suspected that they were in danger because of a hand motion made by the appellant in this case. We find that the evidence offered does not support such a theory and hold that the search was invalid. Thus, the evidence should have been excluded.

The evidence in this case concerning the circumstances surrounding the search reveals the following facts. Officer Evans of the Indiana State Police testified that he was on patrol

at about midnight on May 2, 1970, in the City of Batesville, Indiana. He was accompanied by Officer Dramann, a police officer of Batesville, who testified that he had had no formal police training and was riding with Officer Evans to learn more about police work although he was off duty. Officer Evans pulled the appellant's car over for driving without his right front headlight. Officer Dramann testified that prior to stopping the appellant's car he recognized the appellant, who was driving the car; he knew that the appellant did not own the car; and he had heard that the appellant had a criminal record although he did not know the details.

As the appellant's car was stopping, both officers testified that they saw the appellant raise his hand up to the sunvisor area and then drop it down again. The appellant had been going the opposite direction from the police car and stopped his car across the street from the officers. He then alighted from his car and met the officer near the middle of the street and inquired as to why he had been stopped. Officer Evans informed him that his right headlight was out and asked for a driver's license, which the appellant produced. At this point, the officer testified as follows:

"Q. I see. What did you do right after you examined his driver's license?

A. He went into the car and pulled down the sunvisor for me as I had asked.

Q. What was the reason for this?

A. To check what had been placed up there, up in that area.

Q. Well, how do you know anything was placed up there in that area?

A. I saw Mr. Sayne place an object of some sort above the sunvisor area as he was pulling to the curb and stopping.

Q. Do you have any idea what it was?

A. I did not.

Q. Is it possible he was removing something from the top of the sunvisor at the time you saw him reach up there?

A. Anything is possible.

Q. Okay. For what reason did you want to see what he had placed up there?

A. For possible danger to my life and officer Dramann.

Q. He was already out of the car was he not?

A. Many police officers have been shot after they have given a traffic citation and gone back to their car and it wasn't going to be I."

The officer admitted that he did not frisk the appellant before he searched the car. When questioned concerning his reasons for not frisking the appellant the following testimony ensued:

"Q. Before you looked in the car you did not search either one of the defendants then, is that correct?

A. No, sir.

Q. If you were concerned with your safety that either Mr. Sayne or Mr. Maple might harm you wouldn't it be reasonable to check them first before you turned your back on them and looked in the car?

A. My immediate concern was whatever this article was that I thought had been placed in that area.

Q. Is it your opinion that it was under his immediate control and within his immediate reach to harm you?

A. At the time he was outside—

Q. Yes, sir.

A. No.

Q. Well, then wouldn't it be reasonable to assume that if he was going to hurt you he might have something on his person and you would want to check for that first?

A. Not if he placed it up there in the meantime.

Q. But you don't know if he placed it up there in the meantime do you?

A. That I do not."

While justifiable caution is always called for in even the most routine traffic stop, a search of the driver and the front seat of the automobile is not the only cautionary method possible, although it is surely one of the most extreme methods

.in terms of its intrusion on the freedom of our citizenry. Further, we must agree with the court in *Grundstrom* v. *Beto,* 273 F. Supp. 912 (N. D. Tex. 1967), quoting from *Lane* v. *State,* 424 S. W. 2d 925 (Tex. Ct. App. R. 1967), where it was said:

> "To say that an officer who turns his back on the driver whom he has arrested, while he first searches the driver's automobile is conducting a reasonable search incident to the arrest and not conducting an exploratory search staggers the credibility of anyone who pauses to examine the reasoning." 273 F. Supp. 918 (fn.).

This attempt to justify the search on the grounds that the appellant appeared to put something under the sunvisor becomes even more attenuated when the officer attemps to use the same theory to justify a search of the entire front seat of the car. After finding nothing in that area, Officer Evans went around to the passenger side of the automobile, asked the passenger to step out, and began to search that side of the car, including the area under the seat. The following colloquy occurred concerning this broader search:

> "Q. Did you see him reach any place else in the car?
> A. I didn't see him reach any place else, no, sir.
> Q. Well, then why did you search the rest of the car?
> A. I checked over there to see if there were weapons there.
> Q. But you had no reason to believe there might be any weapons there at all did you because you saw no one reach there?
> A. If I were right about the first there could be others also.
> Q. Could it be that you could have been dead wrong that he reached up there and took something out and put it in his pocket before he got out of this car?
> A. I could have, yes, sir.
> Q. Unhu. But you didn't bother to search him before you looked in the car?
> A. No, sir, I did not."

Officer Dramann, who was riding along for educational purposes, stayed in the police car until after Officer Evans

had checked the appellant's driver's license. He then walked across the street in time to see Officer Evans shine his flashlight into the sunvisor area. As he approached the driver's side, Officer Evans walked around to the passenger's side and the appellant was left standing by the front fender of the automobile. Officer Dramann asked the appellant what he had been reaching for and the appellant replied that he had got a pack of cigarettes. Officer Dramann reached into the car and retrieved a plastic bag containing a small quantity of marijuana which was hidden between the windshield and the canvas convertible top.

Officer Dramann was more candid in admitting that he searched the area for "my own curiosity sake" and when asked what he was looking for replied, "I naturally didn't know what I was looking for, looking for some kind of an article or a weapon possibly." At the time that he conducted the search, he testified that the appellant, who had still not been searched, was standing by the left front fender of the automobile, and that Officer Evans was bent over looking under the front seat on the other side. When he was asked specifically what he was looking for, he replied

"A. I naturally didn't know what I was looking for, looking for some kind of an article or a weapon possibly.

Q. And was this based on—why did you think there might possibly be a weapon?

A. Like I said before Mr. Sayne had a record I didn't know exactly what it was."

Thus, the evidence before us indicates that Officer Evans testified that he could not tell whether or not the appellant had put something under the visor, taken something down from the visor, or, indeed, whether the appellant had anything in his hand at all. In spite of this lack of knowledge, he testified that he did not frisk the appellant for his own protection before he turned his back on him to search under the visor and he justified his search of the other side of the automobile (including a search under the front seat) on the grounds that

since there might have been a weapon in the vicinity of where the appellant reached, there might have been a weapon on the opposite side of the car.

Officer Dramann indicated that he did not know what he was looking for but that he was curious and thought that it might possibly be a weapon because he had heard that the appellant had a record.

If the search were upheld, it is difficult to see what protection our Constitution would give to an operator of a motor vehicle stopped for a traffic offense. Any motion of the arm, or similar gesture, would allow the occupants to be removed from their automobile and subjected to a search, not only of their automobile but of their person. If there exist articulable facts which support the conclusion that the occupants of an automobile stopped for a traffic offense are armed and presently dangerous, then a limited intrusion of the citizen's rights is justified. However, in this case, we cannot agree that knowledge of unknown prior convictions and a simple arm movement is enough to justify such a search. As Justice Hunter said in *Paxton, supra,* at 642, "It will be a sad day indeed when this Court sanctions the detention and search of persons and their property on the mere allegation that they are of suspicious character."

The State also maintains that the search could be justified on the ground that the appellant consented to the search of the automobile. In this case the evidence indicates that the officer asked the appellant to pull down the sunvisor and that the appellant complied with this request, but that he could not remember the exact words he used in making the request. The law in this area was well stated in *U.S.* v. *Payne,* 429 F. 2d 169 (9th Cir. 1970), where it was said:

"When the prosecution seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 797 (1968); United States v. Curiale, 414 F. 2d 744, 747 (2nd Cir. 1969). Though

consent may constitute a waiver of Fourth Amendment rights, Zap v. United States, 328 U.S. 624, 66 S. Ct. 1277, 90 L. Ed. 1477 (1945), to be valid a waiver must be an intelligent relinquishment of a known right or privilege, Johnson v. Zerbst, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). Such a waiver cannot be conclusively presumed from a verbal expression of assent. The Court must determine from all the circumstances whether the verbal assent reflected an understanding, uncoerced, and unequivocal election to grant the officers a license which the person knows may be freely and effectively withheld. Cipres v. United States, 343 F. 2d 95, 97 (9th Cir. 1965)." 429 F. 2d at 171.

Clearly, this search cannot be legitimized by the finding of consent in this case. At the most the facts before us indicate that the "so-called consent," constitutes nothing more than *passive submission* to the search and therefore falls far short of a voluntary and intelligent waiver or "relinquishment of a known right or privilege."

Judgment reversed and a new trial ordered.

Hunter and Prentice, JJ., concur; Arterburn, C.J., dissents with opinion in which Givan, J., concurs.

## DISSENTING OPINION

ARTERBURN, C.J.—I dissent from the majority opinion in this case for the reason that Trooper Evans asked for permission to search defendant's automobile, so far as what he had placed above the sun visor and defendant freely and voluntarily gave his consent.

It appears to me that if a police officer may not investigate or search a car after consent is given as in this case, there is no case under the law in Indiana, in which a police officer may search an automobile after consent is given.

Givan, J., concurs.

NOTE.—Reported in 279 N. E. 2d 196.