JAMES F. WALKER v. STATE OF INDIANA.

[No. 3-972A62.   Filed March 7, 1973.   Rehearing denied May 8, 1973.
Transfer denied August 30, 1973.]

*Ralph R. Blume,* of Fort Wayne, for appellant.

*Theodore L. Sendak,* Attorney General, *Anthony J. Metz, III,* Deputy Attorney General, for appellee.

SHARP, J.—In this case the Appellant, James F. Walker, was charged by way of affidavit of the offense of professional gambling under IC 1971, 35-25-1-2, Ind. Ann. Stat. § 10-2330 (Burns 1972). The Appellant explicitly waived a trial by jury and this case was tried before the trial court alone. The Appellant was found guilty by the trial court and sentenced to the Indiana State Farm for a period of six months and assessed a fine in the sum of $500.00. Motion to Correct Errors was duly filed and overruled resulting in this appeal.

Examining the factual record with the inferences most

favorable to the State it is disclosed that on April 5, 1971 three members of the Fort Wayne Police Department along with a member of the Indiana State Police went to 1233 South Lafayette Street in Fort Wayne, Indiana to execute two arrest warrants for Robert L. Stewart and James Bates, Sr. The arrest warrants were in reference to the offense of professional gambling. These police officers arrived at the above address at approximately 1:00 o'clock P.M. The building at this address faces Lafayette Street with a door to the south portion on the north end of the building and a door to a storeroom or a utility room on the south end of the building. The building is used as a cigarette and cigar store with the business name of Stewart's Smoke Shop. When the police arrived at Stewart's Smoke Shop they knew that James Bates, Sr. was in the south portion of the building and that Robert Stewart was in the store portion of the building. The police officers entered the store building portion of the Smoke Shop building first. They advised Robert L. Stewart that they had a warrant for his arrest, read the warrant to him, advised him of his rights, and asked him for a key to the south portion of the Smoke Shop. Robert L. Stewart was the operator of the business and the owner of the real estate upon which the Smoke Shop was situated. One detective then stayed with Stewart while two other detectives went to the south door of the Smoke Shop. At this point it is necessary and desirable to consider the precise testimony of officer Lloyd Ellis:

"Q And then, as I understand your testimony, you asked him for a key. Now, what was this key for?

A Well, this key would be for the room that we seen Mr. Bates earlier go into this room.

Q How long prior to your arrival had you seen Mr. Bates go into this room, if you can recall?

A We went there earlier and we were hoping that there would be more people in there, and we had seen Mr. Bates, he was the only one we knew definitely was there, and it was about fifteen or twenty minutes prior before that he arrived, that he went into this back room there.

Q All right, you asked Mr. Stewart, as I understand it, for the key to this other room, is that correct?

A Yes.

Q Did he give it to you?

A Yes, he gave me a key.

Q Then what, if anything, did you do?

A I left Detective Platt there with Mr. Stewart and myself and Detective Snyder went out the door, the Smoke Shop, and went approximately twenty feet to the other door, and I tried the key and it unlocked, but there was evidently another lock on the inside that had to be unlocked. So I knocked on the door, and after this Mr. Bates came to the door, opened the door and stepped back and I stepped in.

* * * *

Q Was there any conversation that occurred at that time?

A I think I just said to him, 'James Bates,' and he just kind of nodded, and as he did he stepped back into the back part.

Q He stepped back away from you when he saw you?

A Yes, it would be about three steps, as I recall. There's a partition, sort of like a wind-break, as you open the door so that you can't see into the building. You've got to walk in about two steps and then turn about a step or two steps and you're behind that partition. He stepped back toward, back by the partition.

Q What, if anything, did you do at that time?

A I stepped back with him.

Q And what, if anything, did you observe at that time?

A Well, as soon as I stepped back past this partition, wind-break, or whatever you want to call it, I observed the defendant Mr. Walker sitting at a table with the adding machine and the number slips, and . . .

* * * *

Q Detective Ellis, with regard to number slips, can you tell the court what you mean by number slips?

A Well, number slips are any type of paper or a slip of paper, it can be any form, with a combination of three numbers crossed, or they can be boxed or squared, with a dash on them, there will be a figure such as $1.50, and these are bets that are made on the stock market quotations, advances, declines and unchanged for the day. And also you will have a number or code number

for the writer who will be on this slip and initials of the person purchasing this slip, and down at the bottom will be the total amount bet on the slip; there will be a date on this slip. These are slips that are used in the numbers.

Q You mean the people purchase these slips with a number on them for money?

A Right.

Q And this is wagering, correct?

A Yes, wagering.

Q All right, now, prior to April 5, 1971, had you occasion to see or personally examine number slips, were you familiar with them, in other words?

A Yes, we have made purchases on these number slips.

Q And, as a matter of fact, prior to April 5, 1971, had you been engaged in investigation of the numbers racket?

A Yes, sir.

Q In the course of that investigation, did you have occasion to see or familiarize yourself with number slips?

A Yes, sir.

Q And the numbers game as it was played at that particular time?

A Yes, sir.

Q And are you telling the court, from your experience, that the slips that you observed on the table in the premises at 1233 South Lafayette Street were, in your opinion, number slips?

A Yes, sir, they were number slips.

Q All right, would you continue, please, then, to relate to the court what you observed on your entry into this side room?

A Well, as I came around the side there, I looked over, I looked around the whole room, and as I looked over, I saw only one other person there in this back room who was James Walker, and there was two round tables sitting side by side and these slips were stacked in different stacks and they had an adding machine tape on with a total, and they were stapled together— the slips were stapled. There was stacks of money that had been stacked into piles, and there was some change there, I believe, and an adding machine and some

scratch paids with figures on the table. These were sitting directly in front of where Mr. Walker was sitting.

Q Now, as I understand it, he was seated at one of these round tables?

A Yes, sir.

Q And what, if anything, did he do upon your entry into the room?

A Nothing. He just leaned back in his chair and sat there.

\* \* \* \*

Q And before you entered this room and observed the defendant and the money and number slips on the table, as you have testified, did you conduct any search of that room?

A Of the back room?

Q Yes.

A No, I hadn't conducted any search until after I placed Mr. Bates under arrest, read the warrant to him and advised Mr. Walker he was under arrest on a pre-liminary charge of professional gambling. I searched both subjects.

Q Did you have to move anything or uncover anything to see these number slips, money, adding machine or the defendant?

A No, before we picked anything up or moved anything, we called for a photographer and had him photograph it just as we found it when we walked in.

\* \* \* \*

Q All right, now you've stated that you placed Mr. Walker under arrest at that time for a preliminary charge of professional gambling, is that correct?

A That's right.

Q What, if anything, did you do at that time?

A Well, I searched the subject.

Q What, if anything, did you find?

A I found in his pockets, his pants pocket, I found $250 and some odd change and two slips that I identified myself as being number slips and some other personal papers, car registration and some odds and ends that were in his jacket, and things like this."

On cross-examination by the Appellant's counsel, Officer Ellis testified, in part, as follows:

"Q Officer, when you first entered the building, would you be able to observe these two tables and the objects shown here by looking through the front door?

A From outside, standing on the sidewalk?

Q Without going inside the room?

A No, you would have to . . . You couldn't see it standing in the doorway. This wall here, that you see here, where these two tables are against it, is a thin partition, and the doorway is about two foot, and you have to step over and then up, and this is where Mr. Bates stepped. He reached around this corner and unlocked this door, and I stepped up here to come up where he was standing and then I look over to the side and there was these two tables (referring to State's Exhibit No. 1).

Q But you have to walk inside the building to get the view of these tables, is that right?

A Yes, you have to go inside the building approximately two foot.

Q So that simply a plain glance through the door would not reveal those tables?

A No, you couldn't see them from standing in the doorway.

Q Now, where was Mr. Bates in relation to those tables when you first observed him?

A When I first observed Mr. Bates, he came around that corner of that partition, reached over, unlocked the door, and there is a small step about the size of this (indicating) to step up and, say, like the door was here. He unlocked it and I stepped around about this far (indicating) and he backed up—he backed up past that partition and I backed up to him, and there would be the tables. He was standing right at the edge of the table, actually, off to the side.

Q All right, did Mr. Bates do or say anything to you at that time?

A No he didn't say anything. I just told him I had a warrant for his arrest, and as I come up to read it to him, all I had to do was turn over to the side and there was the two tables sitting there."

The trial court also had before it photographs to supplement the oral testimony of the police officers in addition to the evidence introduced from the person of the Appellant and from the tops of the two tables in question. From the evidence it is clearly inferable that the so-called "windbreak" in the partition in question formed an entryway into and was a part of the room in which Bates and the Appellant were located at the time of their arrests. It is also clearly inferable that all of the events which transpired after the entry of the two police officers with the arrest warrant for Bates occurred inside the same room. When Bates and the police took two steps from the entryway they did not enter a different room but only completed their entry into the same room. On this question the trial court had a choice between the testimony of the police officers and of Bates. The evidence clearly infers that we are here concerned with one room not two. The only evidence in any way contrary to the testimony of the police officers was given on behalf of the Appellant by said James Bates, Sr. whose credibility was challenged by impeaching evidence.

In order to determine this appeal we must consider the following issues:

1. Whether some of the items of evidence introduced were incident to a legal arrest and whether they were in plain view of the arresting officer when he arrested the Appellant without a warrant.

2. Whether there was probable cause to arrest the Appellant for the offense of professional gambling without an arrest warrant.

3. Whether the items taken from the person of the Appellant constituted a search of his person incident to a valid arrest.

4. Whether all of the evidence presented was sufficient to sustain a conviction of guilty of professional gambling.

## I.

For our purposes here we will assume that the arrest warrant for Bates was a valid one and was sufficient to authorize the presence of the two police officers in this particular room at this particular time for the purpose of properly executing such arrest warrant. IC 1971, 35-1-19-6, Ind. Ann. Stat. § 9-1009 (Burns 1972), provides as follows:

> "To make an arrest in criminal actions the officer may break open any outer or inner door or window of a dwelling house or any other building or inclosure to execute the warrant, if, after notice of his authority and purpose, he be refused admittance."

In *McGregor* v. *State* (1928), 200 Ind. 496, 163 N.E. 596, the police officers had gone into a public store maintained by the defendant to apprehend a law violator and finding the door of an adjoining room open were authorized to enter to make an arrest and if necessary, could have broken open the door.

Even under the testimony offered by Bates under the above statutory and case authorities the police officers were properly in the room with Bates and the Appellant for the purpose of executing a valid arrest warrant.

We must next turn to the question of probable cause for the arrest of the Appellant on the charge of professional gambling without a warrant. At the time of the arrest of Bates pursuant to a valid arrest warrant, in the same room, in plain view of the arresting officer was the Appellant sitting in front of two tables. The photographs of these two tables as they appeared at that time were placed into evidence. We have carefully examined these photographs in the transcript. On these tables were an electric adding machine plugged into an electric wall socket, on the table by the adding machine were piles of so-called "number slips". There were adding machine tapes stapled to the stacks of number slips, and there

were stacks of currency and some small change. There were also scratch pads with figures and several ball point pens, ashtrays and matches. All of these were directly in front of the Appellant as he sat facing these items on these two small round tables which had been pushed together. These number slips were introduced into evidence and had been carefully examined by this court.

In *Smith* v. *State* (1971), 256 Ind. 603, 271 N.E.2d 133, 136, our Supreme Court stated:

> "The test for probable cause to make an arrest is whether at the time of the arrest the facts and circumstances within the knowledge of the officers and of which they ▉ had reasonably trustworthy information were sufficient to warrant a prudent man of reasonable caution in believing that the arrestee had committed or was committing an offense." (citing numerous authorities)

In this case the police officers had information that a numbers gambling activity was operating out of the premises of Stewart's Smoke Shop, that Bates, from whom an ▉ arrest warrant had been issued, was a known gambler, there were number slips and currency in piles with adding machine totals connected with the piles, an electric adding machine in use in close proximity to this Appellant at the precise time of his arrest. Certainly under all of these circumstances there was probable cause for the arrest of the Appellant.

## II.

Having concluded that there was sufficient probable cause for his arrest we must next determine whether or not the items of evidence in plain view on the two tables in question which were immediately in front of the Appellant and the items taken from his person at that time by the arresting police officers were properly admitted into evidence.

In *Harris* v. *United States* (1968), 390 U.S. 234, 236, a unanimous Supreme Court of the United States, with one

justice not participating and with Justice Douglas concurring separately, stated:

> "Once the door had lawfully been opened, the registration card, with the name of the robbery victim on it, was plainly visible. It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence. Ker v. California, 374 U.S. 23, 42-43 (1963) ; United States v. Lee (1927), 274 U.S. 559; Hester v. United States, 265 U.S. 57 (1924)."

Our Supreme Court followed *Harris* in *Alcorn* v. *State* (1970), 255 Ind. 491, 265 N.E.2d 413, 416, where it said:

> "The word 'search' connotes uncovering that which is hidden, prying into hidden places for that which is concealed. It is not a search to observe what is open to view."

See also, *Presley* v. *State* (1972), 152 Ind. App. 637, 284 N.E. 2d 526; *Griffiin* v. *State* (1972), 259 Ind. 205, 285 N.E.2d 644; and *Luckett* v. *State* (1972), 259 Ind. 174, 284 N.E.2d 738.

*Harris* v. *United States* and the above authorities from the Indiana Supreme Court are sufficient to authorize the introduction and consideration into evidence of the items on the top of the two tables which were in plain view of the arresting officer at the time of their arrest of the Appellant.

## III.

The next question relates to the $250 in currency and the two number slips which were taken from the clothing on the Appellant's person at the time and place of his arrset by the arresting police officers.

In *Chimel* v. *California* (1969), 395 U.S. 752, 762, Mr. Justice Stewart, speaking for a majority of the Supreme Court, stated:

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to reach the area from within which he might gain possession of a weapon or destructible evidence."

In *Chimel* there was no basic disagreement between the majority and the dissenters over the question of a search of the person at the time and incident to a valid arrest. Likewise, in *Paxton* v. *State* (1970), 255 Ind. 264, 263 N.E.2d 636, there was no basic difference in our own Supreme Court when it followed and applied *Chimel*. In *Paxton* as in *Chimel* both the majority and dissenting opinions were premised on the accepted proposition that an arresting police officer may, incident to a valid arrest, search the person and the clothing of the arrestee. The Appellant in this case would have us interpret *Chimel* and *Paxton* as limiting such search to situations in which there is a question of the safety of the arresting officer. The plain language in *Chimel* is quite clear that there is an additional and equal reason for such a search and that is to "search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction".

Our Supreme Court has had the occasion to follow and apply the rules relating to search incident to a legal arrest on several recent cases. See *Sanchez* v. *State* (1971), 256 Ind. 140, 267 N.E.2d 374; *Farrie* v. *State* (1971), 255 Ind. 682,

266 N.E. 212; and *Luckett* v. *State* (1972), 259 Ind. 174, 284 N.E.2d 738.

The search of the Appellant's person in this case was constitutionally permissible and the products of that search were not constitutionally excludable from evidence.

## IV.

Reviewing an allegation that a verdict in a criminal case is contrary to law and is not sustained by suffiicent evidence, we will not weigh evidence or resolve the credibility of witnesses. Instead, this court will look to that evidence most favorable to the State and the reasonable inferences to be drawn therefrom and the conviction will be affirmed, if from that viewpoint, there is substantial evidence of probative value from which the trier of facts could reasonably infer that the Appellant was guilty beyond a reasonable doubt for the crime for which he was reasonably convicted. See *Riner* v. *State* (1972), 258 Ind. 428, 281 N.E.2d 815, *Buise* v. *State* (1972), 258 Ind. 321, 281 N.E.2d 93; and *McKinley* v. *State* (1972), 258 Ind. 348, 281 N.E.2d 91.

It is also well established that a conviction may be sustained even though it is based wholly on circumstantial evidence. See *Miller* v. *State* (1972), 153 Ind. App. 54, 285 N.E.2d 843, and *Vaughn* v. *State* (1971), 255 Ind. 678, 266 N.E.2d 219.

Recently in *McAfee* v. *State* (1973), 259 Ind. 687, 291 N.E. 2d 554, 556, Justice Prentice stated:

"The evidence in this case is circumstantial, but conviction may be sustained by circumstantial evidence alone, and we can not say that, based on that evidence, although only circumstantial, and the reasonable inferences to be drawn therefrom the evidence is insufficient as a matter of law. Where the sufficiency of circumstantial evidence is in question, we examine it carefully, not for the purpose of finding whether or not it is adequate to overcome every reasonable hypothesis of innocence, but with the view of deciding

whether an inference may be reasonably drawn therefrom tending to support the finding of the trial court. Stice v. State (1950), 228 Ind. 144, 89 N.E.2d 915; Petillo v. State (1950), 228 Ind. 97, 89 N.E.2d 623."

In this case there was a valid arrest warrant for a known gambler on the charge of professional gambling who was known to be at this particular location. The Appellant was found in a room with two sets of locks so as to prevent persons entering without the permission of those inside the room. The inference is clearly permissible that the sole and only purpose of this particular room was the nerve center of a numbers professional gambling operation which is clearly within the definition of professional gambling as found in IC 1971, 35-25-1-2, Ind. Ann. Stat. § 10-2330 (Burns 1972). That evidence clearly permitted the trier of fact to preclude any hypothesis that this room and its occupants were engaged in any "social pastime" as defined in *Peachey* v. *Boswell* (1960), 240 Ind. 604, 167 N.E.2d 48. Even though so-called "policy slips" and "number slips" may not be gambling devices in order to sustain a conviction for possession thereof under the authority of *Brooks* v. *State* (1967), 249 Ind. 291, 231 N.E.2d 816, the evidence of their possession taken together with all of the other evidence here is relevant to the total circumstances which the trier of fact could consider in order to determine a case involving the charge of professional gambling. Here we have much more than a case of mere presence at the scene of a crime. We find the Appellant at the nerve center of a gambling numbers operation in the backroom of a public business establishment which room has a door with two separate locks, one for entry from the outside and one for the inside only. The evidence clearly excludes the hypothesis that this was a place for social respite. We find the Appellant at such time and place under circumstances that clearly point to his participation in this professional gambling operation. When the contents of his pockets are compared with the evi-

dence in plain view the trier of fact, in this case an experienced and highly qualified trial judge, could properly have excluded any reasonable hypothesis of innocence under the above quoted statement from *McAfee*. While possession of the items in Appellant's pockets would not be a crime, the possession of these items in the total circumstantial context of this case, is sufficient to support a conviction of professional gambling. The evidence clearly supports the conclusion that Appellant was a participant in such professional gambling operation.

We find no reversible error in the record here and the conviction is affirmed.

Hoffman, C.J. and Staton, J., concur.