ARTHUR BOYS *v.* STATE OF INDIANA.

[No. 572S61. Filed December 26, 1973.]

*John R. Brant, II, Harlan, Schussler & Keller,* of Richmond, for appellant.

*Theodore L. Sendak,* Attorney General, *A. Frank Gleaves, III,* Deputy Attorney General, for appellee.

GIVAN, J*—Appellant was charged by indictment for the first degree murder of Ernestine Owens. Trial by jury resulted in a verdict of guilty of second degree murder. Appellant was sentenced to Indiana State Prison for the indeterminate period of 15 to 25 years.

The record reveals the following evidence:

The appellant was the decedent's former boy friend.

On July 14, 1970, at 11:00 P.M., Robert Thomas went to the home of Ernestine Owens. Upon entering the house, he found the body of Ernestine Owens wrapped in a drape and lying on the floor.

Authorities who were summoned found that Mrs. Owens had died from forty-four stab wounds to various parts of her body, including her heart and her throat. Tests revealed that Mrs. Owens had type B blood.

Further investigation revealed that at about 5:30 P.M. on July 14, 1970, Ernestine Owens had gone to a grocery store operated by Edna Balthis. Mrs. Balthis testified that while Mrs. Owens was in the store the appellant entered two different times to make small purchases. When Mrs. Owens left the store, appellant was seen driving slowly past her in the same direction. Mrs. Balthis had seen appellant in her store several times, but only when Mrs. Owens was also in the store.

Shortly thereafter, Rheita Day saw the appellant in an alley near Mrs. Owens' home. He was seen walking one direction

---

* This case assigned to the writer June 27, 1973.

in the alley with a bundle under his arm, and shortly thereafter he was seen going in the opposite direction without the bundle. Mrs. Day noticed red spots on appellant's clothing.

About 5:30 P.M. Ulrichia Dixon noticed a tan station wagon parked in front of her house. She memorized the last four digits of the license number. She saw a man with appellant's general description cross the lawn of a neighbor's house in the direction of decedent's house. As he approached her she observed that he had a dark complexion, high cheekbones and a narrow face. In court she identified the appellant as the man she had seen. A certified copy of a Certificate of Auto Registration established that appellant's tan 1965 Pontiac station wagon had the same license number as the car that Mrs. Dixon had seen.

Frances McKinney, a neighbor of Mrs. Owens, saw a man of appellant's general description walking toward Mrs. Owens' home. A short while later she saw a person walking in the opposite direction wearing a pink dress and an "afro-style" hairdo or wig. On the day following the murder, police found a pink dress and an afro-style wig in a puddle of water in the alley where appellant had been seen first carrying a bundle and then going in the opposite direction without the bundle.

At the end of the alley police found a knife. Laboratory tests showed the knife and the dress were spotted with type B blood. Fibers in the hilt of the knife matched fibers from the drape in which Mrs. Owens' body was wrapped.

Phillip Johnson, appellant's son, testified that he had owned a knife such as the one found by the police, and that appellant had taken it from him. At the grand jury hearing Phillip Johnson identified the knife found by the police as his. At the trial, however, he refused to identify the knife as his, but admitted that he had identified it before the grand jury.

Appellant's wife, Juanita Boys, was employed at the City Building and often worked in the police department. Mrs.

Boys had made inquiry of the police as to whether or not her husband was suspected of the murder.

On July 22, 1970, Mrs. Boys was asked by the Chief of Detectives Ronald Chesnut if she knew what clothes her husband had worn on July 14, 1970. Mrs. Boys told him that she did know and gave Chief Chesnut permission to get the clothes from her home. Police officers took Mrs. Boys home. When they arrived, appellant was outside the house. His wife told him why the officers were there. Appellant then entered the house, led the officers to the bathroom where the clothes were soaking in the tub. Appellant wrung out the clothes and gave them to the police officers and stated, "I'll be glad when this is all over." An examination of the shirt thus acquired by the officers revealed that it contained stains of type B blood. This clothing also matched the description given by witnesses of the clothing worn by the appellant on the day of Mrs. Owens' death.

Appellant first argues that the court erred in overruling his motion to suppress the shirt and trousers taken from his home by the police and also that the court erred in overruling his motion to suppress the results of the tests performed on those clothes.

Appellant contended in his motion to suppress that the search was made without a warrant and without authority; that the search and seizure was not incident to an arrest and that it was in violation of defendant's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

We do not agree with appellant in his premise that a search was conducted in this case. The police officers had gone to appellant's home at the invitation of appellant's wife. Upon arriving, before entering the home, appellant's wife advised the appellant as to the reason for the presence of the police officers. After being so informed, the appellant voluntarily took the police officers to the bathroom in the home where he

himself removed the clothing from the tub and voluntarily surrendered it to the officers.

Appellant has relied on the case of *Sayne* v. *State* (1972), 258 Ind. 97, 279 N. E. 2d 196, 29 Ind. Dec. 456. However, in the *Sayne* case the officers did, in fact, conduct a search of the Sayne automobile. The decision of the court turned upon whether or not Sayne had given permission for the search or whether it was otherwise lawful. In the case at bar there was no search. The clothing in question was voluntarily turned over to the police officers. They had merely entered the home upon the invitation of appellant and his wife. This Court has previously stated:

> "It appears first that there was no actual search of the home and that one of the occupants voluntarily turned over the exhibits to the police. In the law of searches and seizures, the term 'search' implies a prying into hidden places for that which is concealed."

*McCoy* v. *State* (1960), 241 Ind. 104, 115, 170 N. E. 2d 43.

In the case at bar the trial court did not err in overruling appellant's motion to suppress the evidence.

Appellant next claims the trial court erred in permitting witness to identify the appellant for the reason that the trial court identifications were tainted by a pre-trial photographic identification. Prior to the trial the witnesses had been shown as many as six photographs of the appellant, three of which were prints of the same negative. Mrs. Balthis and Mrs. Day identified each photograph shown to her as that of the appellant. Mrs. Dixon stated that she was not sure that one of the photographs was of the man she had seen in the neighborhood on the day in question. However, each woman testified that her in-court identification of the appellant was based upon observation of him on the day of the crime and observation of him in the court room during the trial and that their identifications were independent of photographs observed prior to trial.

In a recent case this Court was confronted with the same issue. In observing that in-court identification could be admitted under the totality of the circumstances, this Court stated:

" ' . . . the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' " *Sawyer* v. *State* (1973), 260 Ind. 597, 298 N. E. 2d 440, 444, 37 Ind. Dec. 405, 409.

Considering the opportunity that each witness had to observe the appellant on the day of the crime and in view of the testimony of each in identifying the appellant at the trial, we hold that the trial court did not err in permitting the in-court identification of the appellant by the witnesses.

Appellant also claims that the verdict of the jury was not sustained by sufficient evidence in that the State failed to prove that the appellant was assailant of Ernestine Owens. As we have repeatedly said, this Court will look only to that evidence most favorable to the State, together with all reasonable and logical inferences to be drawn therefrom. *Hash* v. *State* (1973), 259 Ind. 683, 291 N. E. 2d 367, 34 Ind. Dec. 635.

In view of the facts above recited there was ample evidence from which the jury could logically conclude that the appellant was, in fact, the person who had caused the death of of the decedent. The evidence, although circumstantial, is sufficient to support the verdict of the jury. We find no error in this case.

The trial court is, therefore, affirmed.

Arterburn, C.J., concurs; Hunter, J., concurs in result with opinion in which DeBruler, J., concurs; Prentice, J., dissents without opinion.

### OPINION CONCURRING IN RESULT

Hunter, J.—I concur in the result. However, I cannot characterize the factual situation in this case as anything

but a search. I base this conclusion on the fact that the purpose of the visit was to obtain criminal evidence.

Notwithstanding my belief that this was a search, I believe that the record before us indicates a consensual search and that the appellant was fully cognizant of its true import and possible consequences. In this case, the queries by the police officers could only have been construed as an attempt to gather evidence against appellant. Under the "totality of circumstances" (for example, his wife being employed by the police department), I am confident that appellant was aware of his Fourth Amendment rights.

However, I believe many future problems would be solved by requiring police to fully inform individuals of their Fourth Amendment rights and, particularly, that the individual may require the police to obtain a valid search warrant. I believe this requirement is essential if we are to have truly informed consensual searches. I would go so far as to suggest a written waiver form with the Fourth Amendment rights printed thereon.

DeBruler, J., concurs.

NOTE.—Reported in 304 N. E. 2d 789.